**ARNALL GOLDEN GREGORY LLP**
Richard T. Collins (Bar No. 166577)
rich.collins@agg.com
2100 Pennsylvania Avenue, NW
Suite 350S
Washington, D.C. 20037
Phone: (202) 677-4030

**CALLAHAN & BLAINE, PC**
Michael J. Sachs (Bar No. 134468)
mjs@callahan-law.com
19900 MacArthur Blvd., Suite 1200
Irvine, CA 92612
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Plaintiffs

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

TML RECOVERY, LLC, a California limited liability company; BOHICA INVESTMENTS LLC, a California limited liability company; CARDIFF HEALTH SERVICES LLC, a California limited liability company; CARLSBAD MENTAL HEALTH SERVICES LLC, a California limited liability company; HARBOR HEALTH LLC, a California limited liability company; IMS SERVICES LLC, a California limited liability company; LA COSTA RECOVERY LLC, a California limited liability company; SAN DIEGO MENTAL HEALTH, LLC, a California limited liability company; SOUTHERN CALIFORNIA RECOVERY CENTERS OCEANSIDE, LLC, a California limited liability company; SUNRAY SERVICES, LLC, a California limited liability company,

Plaintiffs,

v.

CIGNA CORPORATION, a Delaware corporation; CIGNA HEALTH AND LIFE INSURANCE COMPANY, a Connecticut corporation;

**Case No.:**

*Assigned to Hon.* ____________

**COMPLAINT FOR:**

1. **CLAIMS FOR PLAN BENEFITS UNDER ERISA, 29 U.S.C. §1132(a)(1)(B)**
2. **BREACH OF WRITTEN CONTRACT**
3. **BREACH OF ORAL CONTRACT**
4. **PROMISSORY ESTOPPEL**

**DEMAND FOR JURY TRIAL**

CIGNA HEALTHCARE OF CALIFORNIA, INC.; a California corporation;
CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a Connecticut corporation;
EVERNORTH BEHAVIORAL HEALTH, INC., formerly known as CIGNA BEHAVIORAL HEALTH, INC., a Minnesota corporation;
CIGNA HEALTH MANAGEMENT, INC., a Delaware corporation;
and DOES 1 through 10, inclusive,
Defendants.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

Plaintiffs TML Recovery, LLC, Bohica Investments LLC, Cardiff Health Services LLC, Carlsbad Mental Health Services LLC, Harbor Health LLC, IMS Services LLC, La Costa Recovery LLC, San Diego Mental Health, LLC, Southern California Recovery Centers Oceanside, LLC, and Sunray Services, LLC (collectively "Plaintiffs"), hereby allege against Defendants Cigna Corporation, Cigna Health and Life Insurance Company, Cigna Healthcare of California, Inc., Connecticut General Life Insurance Company, Evernorth Behavioral Health, Inc., f/k/a Cigna Behavioral Health, Inc., Cigna Health Management, Inc., and Does 1 through 10, inclusive, as follows:

## THE PARTIES

### The Plaintiffs

1. **Plaintiff TML Recovery, LLC**, doing business as So Cal Recovery Centers and also known as Southern California Recovery Centers, So Cal Recovery and SCRC ("TML Recovery") (TIN 46-2916076), is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. At all times relevant herein, TML Recovery provided substance use disorder ("SUD") and mental health treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. At all times relevant herein, TML Recovery was certified by the California Department of Health Care Services ("DHCS") to operate a SUD treatment program and accredited by Joint Commission, Behavioral Health Care Accreditation Program ("JCAHO").

2. **Plaintiff Bohica Investments LLC**, doing business as Encinitas Detox ("Encinitas Detox") (TIN 81-2642353), is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. At all times relevant herein, Encinitas Detox provided SUD treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of

society. At all relevant times herein, Encinitas Detox was licensed by the DHCS to operate a SUD treatment program, possessed a Clinical Laboratory Improvement Amendments (CLIA) certificate of waiver, and accredited by JCAHO.

3. **Plaintiff Cardiff Health Services LLC,** ("CHS") (TIN 93-4320848) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. At all times relevant herein, CHS provided SUD and mental health treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. At all times relevant herein, CHS was licensed by the DHCS to operate a SUD treatment program . At all times relevant herein, CHS was licensed by the California Department of Public Health (CDPH), possessed a CLIA certificate of accreditation, and accredited by the Commission on Laboratory Accreditation (COLA) as a laboratory for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body.

4. **Plaintiff Carlsbad Mental Health Services LLC,** ("CMHS") (TIN 83-3775366), is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. At all times relevant herein, CMHS provided SUD treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. At all times relevant herein, CMHS was certified by the DHCS to operate a SUD treatment program, possessed a CLIA certificate of waiver, and accredited by JCAHO.

5. **Plaintiff Harbor Health LLC,** doing business as Pacific View Detox ("Pacific View Detox") (TIN 37-2066147), is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

State of California. At all times relevant herein, Pacific View Detox provided SUD treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. At all relevant times herein, Pacific View Detox was licensed by the DHCS to operate a SUD treatment program and accredited by JCAHO. At all times relevant herein, CHS was licensed by the CDPH, possessed a CLIA certificate of accreditation, and accredited by COLA as a laboratory for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body.

6. **Plaintiff IMS Services, LLC**, doing business as Harbor Detox ("Harbor Detox") (85-1556067), is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. At all times relevant herein, Harbor Detox provided SUD treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. At all times relevant herein, Harbor Detox was licensed by the DHCS to operate a SUD treatment program, accredited by JCAHO, and had a CMS CLIA certificate of accreditation. At all times relevant herein, Harbor Detox was licensed by the CDPH and accredited by the CMS and COLA as a laboratory for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body.

7. **Plaintiff La Costa Recovery LLC**, doing business as Leucadia Detox (Leucadia Detox") (TIN 99-2804853) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

California. At all times relevant herein, Leucadia Detox provided SUD treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. At all times relevant herein, Leucadia Detox was licensed by the DHCS to operate a SUD treatment program and accredited by JCAHO.

8. **Plaintiff San Diego Mental Health, LLC** ("SDMH") (TIN 33-2070673), is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. At all times relevant herein, SDMH provided SUD and mental health treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. At all times relevant herein, SDMH was certified by the DHCS to operate a SUD treatment program and accredited by JCAHO.

9. **Plaintiff Southern California Recovery Centers Oceanside, LLC**, also known as Southern California Recovery Centers, So Cal Recovery and SCRC ("SCRCO") (TIN 47-4573182), is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. At all times relevant herein, SCRCO provided SUD treatment, serving to help individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. At all times relevant herein, SCRCO was certified by the DHCS to operate a SUD treatment program and accredited by JCAHO.

**10.** **Plaintiff Sunray Services, LLC** ("Sunray Services") (TIN 85-1546211) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. At all times relevant herein, Sunray Services provided clinical laboratory services to those in the process of recovering from mental health and SUDs. At all times relevant herein, Sunray Services was licensed by the CDPH, possessed a CLIA certificate of

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

accreditation, and accredited by the CMS and COLA as a laboratory for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body. At all times relevant herein, Sunray Services served as a full service, CLIA-compliant, high complexity reference specialty laboratory that combines state of the art laboratory testing processes, methodologies and cutting-edge technology for its specialization in urine toxicology drug confirmation testing which is designed to provide accurate results that help physicians and clinicians create a scientifically designed drug monitoring strategy for optimal treatment outcomes.

**The Defendants**

11. On information and belief, **Defendant Cigna Corporation** is a Delaware corporation conducting insurance operations nationwide. Cigna Corporation represents itself as a global health service organization and operates under the federally registered service mark "Cigna." Cigna Corporation markets and issues health insurance and insures, administers, and makes coverage and benefit determinations. It develops and applies SUD and mental health treatment and laboratory services guidelines in making coverage and benefit determinations related to healthcare policies nationwide, including the plans at issue in this action, through its subsidiaries, controlled agents, and undisclosed principals. These include but are not limited to Defendants Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Health Management, Inc. (collectively with Cigna Corporation "Cigna"), , and Does

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

1 through 10, inclusive, as well as non-parties Viant, Inc. ("Viant")[1] and Claritev, Inc, f/k/a MultiPlan, Inc., ("MPI", collectively with Viant "MultiPlan"),[2] under the name "Cigna."

12. On information and belief, **Defendant Cigna Health and Life Insurance Company** ("Cigna Health and Life") is a Connecticut corporation conducting insurance operations nationwide. It markets and issues health insurance, insures, administers, and makes coverage and benefit determinations. It also develops and applies SUD and mental health treatment and laboratory services guidelines in making coverage and benefit determinations for plans, including the plans at issue in this action, it insures, manages, and/or administers in conjunction with Cigna Corporation and its affiliates.

13. On information and belief, **Defendant Cigna Behavioral Health of California, Inc.** ("Cigna Behavioral Health CA") is a California corporation that conducts insurance operations throughout California. Cigna Behavioral Health CA markets and issues health insurance and insures, administers and makes coverage and benefit determinations, develops and applies substance use disorder and mental health treatment and laboratory services guidelines and criteria in making coverage and benefit determinations related to the plans at issue in this action, and participates in the claims administration process related to plans insured, managed and/or

---

[1] Viant presents itself as a provider of healthcare payment solutions, including auditing, reimbursement for behavioral health and SUD claims, and prepayment services such as treatment facility bill reviews and professional negotiations, on behalf of plans insured, managed, and/or administered by Cigna Corporation and its affiliates.

[2] MPI presents itself as a provider of healthcare cost management solutions, claiming to provide claim cost management solutions for controlling the financial risks associated with health care bills on plans insured, managed and/or administered by Cigna Corporation and its subsidiaries and affiliates. MPI also offers preferred provider organization network solutions for accessing hospitals, ancillary care facilities, treatment facilities, and health care professionals for the benefit and at the control and direction of Cigna Corporation and its subsidiaries and affiliates.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

administered by Cigna Corporation and its subsidiaries and affiliates. Cigna Behavioral Health CA is licensed and regulated by the CDI and the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

14. On information and belief, **Defendant Connecticut General Life Insurance Company** ("Connecticut General") is a Connecticut corporation conducting insurance operations nationwide. It markets and issues health insurance, insures, administers, and makes coverage and benefit determinations. Connecticut General also develops and applies SUD and mental health treatment and laboratory services guidelines for plans, including the plans at issue in this action, it insures, manages, and/or administers in conjunction with Cigna Corporation and its affiliates.

15. On information and belief, **Defendant Evernorth Behavioral Health, Inc., f/k/a Cigna Behavioral Health, Inc.** ("Cigna Behavioral Health") is a Minnesota corporation conducting insurance operations nationwide. It markets and issues health insurance, insures, administers, and makes coverage and benefit determinations. It develops and applies SUD and mental health treatment and laboratory services guidelines for plans, including the plans at issue in this action, it insures, manages, and/or administers in conjunction with Cigna Corporation and its affiliates.

16. On information and belief, **Defendant Cigna Health Management, Inc.** ("Cigna Health Management") is a Delaware corporation conducting insurance operations nationwide. It markets and issues health insurance, insures, administers, and makes coverage and benefit determinations. It develops and applies SUD and mental health treatment and laboratory services guidelines for plans, including the plans at issue in this action, it insures, manages, and/or administers in conjunction with Cigna Corporation and its affiliates.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

17. Plaintiffs are informed and believe that, at all relevant times, each Defendant acted as the agent, servant, representative, undisclosed principal, and/or alter ego of the other Defendants. In doing the acts alleged, each Defendant acted within the scope of its authority and with the permission and consent of the other Defendants. Plaintiffs are further informed and believe that Defendants commingled assets and business operations, ignored corporate formalities, undercapitalized their operations, and exercised dominion and control over one another to such an extent that any separateness between Defendants has ceased. As such, Defendants are alter egos of one another, sharing common ownership, business locations, management, and operating as a single enterprise.

18. Plaintiffs are informed and believe that Defendants conspired to prioritize profits over patients, engaging in conduct as alleged herein to damage SUD treatment providers, including Plaintiffs. Defendants acted, and continue to act, in concert, knowingly violating laws for their secret financial profits, and provided substantial assistance to one another in furtherance of this conduct. Defendants' misconduct is and has been the subject of investigations by state and federal regulatory authorities.

## BRIEF STATEMENT OF THE CASE

19. Plaintiffs are out-of-network ("OON") SUD treatment providers and clinical laboratories. Plaintiffs are in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. Between March 1, 2022 and continuing through the present, Plaintiffs provided, and continue to provide, medically necessary, verified, preauthorized, and covered SUD treatment and services to individuals with health insurance that was sold, insured, managed and/or

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

administered by Defendants.[3] The treatment and services provided by Plaintiffs include residential detoxification and residential treatment ("RTC"), partial hospitalization/day treatment ("PHP"), intensive outpatient ("IOP"), outpatient ("OP"), treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, laboratory and diagnostic services, and case management. The treatments and services were provided by and within the scope of practice of properly qualified, licensed and certified behavioral health providers, medical and clinical directors and professionals, in a safe, supportive and encouraging recovery environment, consistent with prevailing professionally recognized standards of SUD treatment and services and known to be effective in improving health care outcomes for individuals with mental health and SUDs.

20. Defendants' health insurance plans, for each of the patients at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, allow the insureds to obtain SUD treatment from an in-network provider ("INN") or OON provider ("OON"), like Plaintiffs. In this regard, the plans, and each of them, provide that OON SUD benefits include the following levels of care: RTC, PHP, IOP, and OP. The plans also provide that covered OON SUD services include diagnostic tests and evaluations, assessment and treatment planning, treatment and procedures, counseling, individual, family and group therapy, behavioral treatment

[3] Between March 1, 2022 and March 15, 2026, Plaintiffs treated 83 individuals. With Plaintiffs' company names and TINs, Defendants—and each of them—have access to extensive information in their systems regarding each of Plaintiffs' patients. This includes, but is not limited to, patient names, dates of birth, family relationships, insurance plan/policy details (including type, funding source, and state of issuance), coverage dates, service dates, procedure codes, billing codes, revenue codes, diagnosis codes, types and levels of care provided, claim dates, billed amounts, paid amounts, amounts not covered, denial codes, claim pricing details, explanations of benefits (paid or denied), appeals and grievances related to claim determinations, and cost containment fees received by Cigna and MultiPlan. The information available to Defendants through Plaintiffs' company names and TINs is more than sufficient to apprise them of the substance of Plaintiffs' claims. Following the filing of the complaint, Plaintiffs will produce claims reports to Defendants, which reports further detail claims and coverage issues against Defendants in this action. Because Defendants' misconduct as described in this Complaint is ongoing, Plaintiffs anticipate supplementing their claims reports to identify additional affected claims, patients, and dates of service in a timely manner.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

and therapy, medication management, psychological testing, case management services, clinical laboratory testing, and crisis intervention.

21. Defendants' health insurance plans, for each of the patients at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, pay benefits for OON SUD treatment, including, but not limited to, RTC, PHP, IOP, OP, diagnostic tests and evaluations, assessment and treatment planning, treatment and procedures, counseling, individual, family and group therapy, behavioral treatment and therapy, medication management, psychological testing, case management services, clinical laboratory testing, and crisis intervention, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans historically paying OON benefits at 70% of covered charges (after any outstanding insured cost-sharing amounts, which Defendants deduct from payments to Plaintiffs)) until the insured's nominal annual out-of-pocket maximum ("AOOPM") is met at which time Defendants pay 100%. Plaintiffs are informed and believe, and based thereon allege, that each of the patients, including the 83 patients treated between March 1, 2022 and March 15, 2026, had already met their AOOPM at the time they first received treatment or services from Plaintiffs, or shortly thereafter.

22. The plans at issue also pay 100% of covered charges (minus any applicable and remaining INN deductibles, copays or coinsurance) in the event of a "network inadequacy" or "network gap" for the services received. In this regard, the plans provide that if the insured is unable to locate an INN provider in their area who can provide a service that is covered under the plan, like SUD services, and the insured obtains authorization from Defendants for services provided by an OON provider, benefits for those services will be covered at the INN benefit level. Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein, Defendants had an inadequate network of SUD treatment providers and clinical laboratories and Defendants preauthorized the treatment and services at

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

issue to be rendered by OON providers; and therefore, Defendants were required to reimburse claims for authorized services at 100% of billed charges minus any remaining INN deductibles, copays or coinsurance; which Defendants failed to do.

23. The exclusions, conditions and limitations in the plans do not apply to the OON SUD treatments and laboratory services provided by Plaintiffs.

24. Defendants' insureds, and each of them, including the 83 patients treated between March 1, 2022 and March 15, 2026, orally assigned their health insurance or plan benefits and rights to payments from Defendants on the claims at issue to Plaintiffs. In this regard, the insureds advised Plaintiffs prior to receiving treatment that they were using their health benefits to pay for their SUD treatment and services at issue herein. In furtherance of this assignment, the insureds, and each of them, provided Plaintiffs with their insurance information and at times a copy of their insurance card, and the insureds called Defendants and authorized Defendants to release their OON SUD benefits to Plaintiffs. Plaintiffs then verified the insureds' OON SUD benefits with Defendants. Thereafter, in accordance with Plaintiffs' customs and practices during the intake and admissions process, the insureds, and each of them, were also informed, understood and agreed that Plaintiffs would submit their claims as provider-assignees to Defendants for payment and that Plaintiffs had the right and were entitled to all payments from Defendants. The insureds, and each of them, further understood and agreed to return to Plaintiffs any payments they received from Defendants on the claims at issue. In reliance on the insureds' oral assignments, Plaintiffs provided the subject SUD treatment and services at issue and submitted their claims to Defendants for payment as the insureds' assignee.

25. In furtherance of the assignments, Plaintiffs also obtained written assignments of benefits from each of the insureds at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only rights to payment from Defendants

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

on the claims at issue but to assert all rights and causes of action against Defendants in connection with payment on the claims. Plaintiffs, and each of them, routinely receive executed assignment of benefits forms from their patients, including the insured-patients at issue herein. It is, and at all times relevant was, Plaintiffs' standard practice and procedure to require each of their patients, prior to their SUD treatment, to execute such a form. This standard practice applied to the insureds, and each of them, at issue herein. If a written assignment of benefits is missing for any of the insureds at issue herein, it is the result of a filing or administrative mistake only.

26. In reliance on the assignments of benefits, Plaintiffs, and each of them, rendered the subject SUD treatment and services to Defendants' insureds/members including the 83 patients treated between March 1, 2022 and March 15, 2026,. Moreover, Defendants confirmed, represented, promised and warranted to Plaintiffs through the required verification of benefits and the preauthorization process and phone calls, that each of the insureds and their respective OON SUD treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants, the premiums were paid, and the plans were effective, and that Plaintiffs would be paid for treating Defendants' insureds. In reliance on Defendants' coverage representations, payment promises and treatment authorizations, Plaintiffs, and each of them, rendered the subject SUD treatment services to Defendants' insureds/members. At all times relevant herein, Defendants knew that Plaintiffs were treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of Plaintiffs' charges for the OON SUD treatment and services rendered, at each level of care and for laboratory services.

27. After providing the covered OON SUD treatment and services to the patients at issue herein, including the 83 patients treated between March 1, 2022 and March 15, 2026, Plaintiffs submitted their claims to Defendants for payment. The

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

claim forms notified Defendants that Plaintiffs were submitting the claims as the insureds' assignee. Plaintiffs' billed charges on the claims at issue, and each of them, are comparable and within the price range of the fees that OON SUD providers and clinical laboratories of the same specialty, in the same region, charge for the same or similar treatments and services. Defendants were obligated – under the law and the plans – to pay Plaintiffs based on their billed charges or based on the usual and customary charges of other providers of the same services in the same area, historically resulting in payment as a percentage of their covered charges (between 50% to 80% of covered charges, with the majority of plans paying OON benefits at 70% of covered charges (after any outstanding insured cost-sharing amounts)) until the insured's AOOPM is met, at which time Defendants pay 100%. Defendants also advised, confirmed and promised to Plaintiffs during the verification of benefits and preauthorization process and phone calls for each of the patients, including the 83 patients treated between March 1, 2022 and March 15, 2026, that the OON benefits paid by Defendants to OON providers, like Plaintiffs, for all levels of SUD treatment and laboratory services, is a percentage of their covered charges or usual and customary charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's AOOPM is met at which time Defendants pay 100%.

28. Instead of paying Plaintiffs per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Plaintiffs, Defendants engaged in unfair, unreasonable, unlawful, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and, with respect to the 83 patients treated between March 1, 2022 and March 15, 2026, paid each Plaintiff between 0% and 28.29% of its covered charges and paid Plaintiffs, as a group, 16.58% ($2,525,006.04) of their aggregate covered charges ($15,225,850.00), leaving an aggregate balance due, with respect to the 83

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

patients treated between March 1, 2022 and March 15, 2026, of $12,700,843.96. This includes, but is not limited to, Defendants' low payments based on inapplicable Medicare rates, down coding, defective databases of purported usual and customary rates for SUD treatment and bundled per diem rates. It also includes Defendants' denial of claims based on overly restrictive level of care guidelines and qualitative and quantitative restrictions on access to coverage and benefits for individuals in SUD treatment and services, including, but not limited to, Defendants' flawed criteria for coverage determinations which, among other things, treat mental health and SUDs as an acute and not chronic condition. These amounts and percentages do not include the harm and losses that have been caused and may in the future be caused by Defendants' ongoing misconduct since March 15, 2026.

29. Plaintiffs are informed and believe, and based thereon allege, that Defendants' misconduct as alleged herein was and is motivated by profits, including, but not limited to, additional money Defendants make on the backend via their secret Administrative Services Agreements ("ASAs") with the plan sponsors, and MultiPlan's bonus program for employees who save its client payors, like Cigna, money on claim payments, including the claims at issue here. Plaintiffs are informed and believe, and based thereon allege, that the Defendants split the profits made on underpaying the claims at issue herein with MultiPlan. These financial motivations benefited Defendants, and each of them, and passed the costs of SUD treatment and services on to the insureds and the providers who treated them, like Plaintiffs; and at times forced insureds to make a Hobson's choice – pay for the costs of treatment themselves or receive no treatment at all.

30. Plaintiffs are also informed and believe, and based thereon allege, that these financial motivations for Defendants created a situation where Defendants often made as much or even more money on the claims at issue than Plaintiffs. Defendants' financial conflicts of interest further rendered Plaintiffs' low payment appeals and reconsideration requests futile, as any additional payments by

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

Defendants to Plaintiffs would have to be paid from Defendants' secret profits on the ASAs, which Defendants refused to do.

31. It was only after Plaintiffs rendered the treatment and services at issue that Defendants refused to properly compensate Plaintiffs for the covered treatment and services rendered to Defendants' insureds.

32. During the claim submission and payment process, Cigna's SIU and Defendants put Plaintiffs on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Plaintiffs, over and over again. This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims. Plaintiffs complied with Defendants' repetitive requests and despite being promised payment pursuant to the plans, Defendants refused to properly reimburse Plaintiffs for the covered treatment and services provided to Defendants' insureds.

33. In reality, Cigna's SIU investigations into Plaintiffs were nothing more than a façade, designed to create the illusion of thoroughness while serving Cigna's financial interests. This further confirms that administrative review by Cigna would be futile. Cigna's SIU worked under the direction of Cigna's C-suite executives and the enterprise, with one goal in mind—secretly profiteering from people's healthcare claims, especially SUD claims. The Cigna enterprise and SIU are one and the same, driven by an insatiable appetite for profits, and more focused on profits than patient care.

34. Defendants likewise failed and refused to provide Plaintiffs and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Plaintiffs and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair. Defendants' audits, bogus TIN flags and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to unlawfully delay and deny Plaintiffs (and hundreds of other SUD treatment providers) payment in accordance with Defendants' representations and promises, and the law and plans.

35. Defendants did not inform or advise Plaintiffs (during the claim submission and payment process or the post-claims process, or at any time prior to this action) about any anti-assignment provisions in the health plans at issue, and Defendants did not deny Plaintiffs' claims or deny payment to Plaintiffs on the grounds of any anti-assignment provisions in the health plans. To the contrary, Defendants treated Plaintiffs as the assignees of the insureds in their direct interactions with Plaintiffs regarding their claims. As a result, and by operation of law and principles of equity, Defendants have waived and are estopped from asserting any such anti-assignment provisions in any of the health plans at issue in this action.[4]

36. Likewise, Defendants did not provide Plaintiffs (during the claim submission and payment process or post-claims process, or at any time prior to this action) with the health plan documents at issue. Similarly, Defendants did not inform or provide Plaintiffs with notice (during the claim submission and payment process or post-claims process, or at any time prior to this action) of any mandatory appeal obligations in the health plans at issue or any requirement in the plans to

---

[4] *See, California Spine and Neurosurgery Institute v. Blue Cross of California*, 2020 WL 3536496 at *1 (9th Cir. June 30, 2020) ("district court erred in determining waiver was inapplicable[;]" and "district court also erred in concluding that [Plaintiff] failed to satisfy three equitable estoppel factors" when insurer asserted for the first time in litigation an anti-assignment provision to avoid coverage.); *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1296 (9th Cir. 2014) (considering an anti-assignment provision and explaining that "an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court."); *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 720 (9th Cir. 2012) ("ERISA and its implementing regulations are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.").

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

exhaust the appeals process to avoid losing the right to litigate. As a result, and by operation of law and principles of equity, Defendants' failure to properly notify Plaintiffs of the need to exhaust administrative remedies to avoid losing the right to litigate is sufficient to obviate any exhaustion requirement in the health plans at issue.[5]

37. As a result of Defendants' unfair, unreasonable, unlawful, incomplete, fraudulent and systematic polices, practices and decisions, Plaintiffs have suffered and continue to suffer general and incidental damages according to proof, including the benefits in the millions owed under the plans and the law, amounts owed in accordance with Defendants' payment promises to Plaintiffs, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and other consequences, and moreover, Plaintiffs are entitled to statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**AMERICA'S SUD EPIDEMIC**

38. Now, as never before, there is a critical need for access to treatment for a SUD. In 2017, the Substance Abuse and Mental Health Services Administration ("SAMHSA") estimated that in 2014, 20.2 million adult Americans, or 8.4 percent of the adult population suffered from a SUD within the past year.[6] According to the

---

[5] This District Court has held that the failure to properly notify Plaintiffs of the need to exhaust administrative remedies is sufficient to obviate any exhaustion requirement. *See, In re Out-of-Network Substance Use Disorder Claims Against UnitedHealthcare*, Case 8:19-cv-02075-JVS-DFM ("*UnitedHealthcare Action*"), Dkt. No. 92 (Order Regarding Motion to Dismiss TAC, April 14, 2021), pp. 5-7 ("The Court agrees with Plaintiffs that United's failure to properly notify the Plaintiffs in the EOBs of the need to exhaust administrative remedies is sufficient to obviate any exhaustion requirement. [] United therefore did have an obligation to instruct Plaintiffs that they must appeal adverse decisions to avoid losing the right to litigate. Plaintiffs' allegations that United failed to do so are sufficient to avoid dismissal for failure to exhaust."); *see also, TML Recovery, LLC et al. v. Cigna Corporation, et al.*, Case 8:20-cv-00269-DOC-JDE ("*Cigna Action*"), Dkt. No. 94 (Order Granting in Part Defendants' Motion to Dismiss, July 26, 2021), p. 8 (Plaintiffs properly alleged that the administrative route is futile because Defendants failed to provide Plaintiffs with a reasonable opportunity to engage in a meaningful claims process and procedure that was full and fair).

[6] *See* Rachel N. Lipari & Struther L. Van Horn, Trends in Substance Use Disorders in Adults 18 and Older (June 29, 2017), retrieved on May 23, 2019 from https://www.samhsa.gov/data/sites/default/files/report_2790/ShortReport-2790.html.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

President's Commission on Combatting Drug Addiction and the Opioid Crisis (November 2017), heroin overdose deaths increased four-fold from 2010 to 2015, while overdose deaths due to prescription opioids consistently outpaced even the disturbingly high heroin overdose rates.[7]

39. The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), 42 U.S.C. § 300gg-26, requires the Secretary of Labor to submit a report to certain appropriate committees of Congress on MHPAEA compliance by group health plans (and issuers of health insurance coverage offered in connection with such plans) every two years. ERISA section 712(f). In January 2025, the Department of Labor ("DOL"), Department of Health and Human Services ("HHS"), and Department of the Treasury ("DOT") issued the 2024 MHPAEA Report to Congress (Jan. 2025) ("MHPAEA Report") (https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/mental-health-parity/report-to-congress-2024.pdf).

40. The MHPAEA Report highlights the critical need for access to SUD treatment:

> "Mental health is crucial to the overall health and wellbeing of every person, and access to quality MH/SUD care is as essential to good health as access to quality M/S [medical/surgical] care. Currently, the United States is experiencing a MH/SUD crisis. The crisis is impacting children and adults nationwide and across demographics, with marginalized and underserved communities affected disproportionately." (MHPAEA Report at 8 (citing SAMHSA. (2024). SAMHSA Releases Annual National Survey on Drug Use and Health. https://www.samhsa.gov/newsroom/press-announcements/20240730/samhsa-releases-annual-national-survey-drug-use-and-health.)
>
> "More than 17 percent of people aged 12 and older in the United States — nearly 49 million people — met the

[7] *See* President's Commission on Combatting Drug Addiction and the Opioid Crisis, Final Report, at p. 32, retrieved on May 23, 2019 from https://trumpwhitehouse.archives.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

applicable Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, criteria for having a substance use disorder in 2023, including more than 27 million who had a drug use disorder and almost 29 million who had an alcohol use disorder." (MHPAEA Report at 10 (citing Substance Abuse and Mental Health Services Administration. (2024). Key substance use and mental health indicators in the United States: Results from the 2023 National Survey on Drug Use and Health (HHS Publication No. PEP24-07-21, NSDUH Series H-59). https://www.samhsa.gov/data/report/2023-nsduh-annual-national-report.)

"In 2020, overdose death rates were increasing by 31 percent year over year. Today, overdose deaths are declining. For the 12-month period ending in July 2024, the number of overdoses is provisionally predicted to be 16.9 percent lower compared to the prior twelve-month period ending in July 2023, but there is still much work to do." (MHPAEA Report at 10-11 (citing National Vital Statistics System. Provisional Drug Overdose Death Counts (Based on data available for analysis on November 12, 2024). https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.)

"The ongoing overdose epidemic has been devastating American families, as well as caregivers and communities. In 2023, an estimated 8.9 million people in the United States age 12 or older misused opioids, including heroin or prescription pain relievers. Nearly 75 percent of drug overdose deaths in 2021 involved an opioid — driven primarily by illicitly manufactured fentanyl, a synthetic opioid that is approximately 50 times more potent than heroin as an analgesic and approximately 100 times more potent than morphine." (MHPAEA Report at 11 (citing Substance Abuse and Mental Health Services Administration. (2024). Key substance use and mental health indicators in the United States: Results from the 2023 National Survey on Drug Use and Health (HHS Publication No. PEP24-07-21, NSDUH Series H-59). https://www.samhsa.gov/data/report/2023-nsduh-annual-national-report; Centers for Disease Control and Prevention. Understanding the Opioid Overdose Epidemic. https://www.cdc.gov/overdose-prevention/about/understanding-the-opioid-overdose-epidemic.html; U.S. Drug Enforcement Administration. Drug Fact Sheet: Fentanyl. https://www.dea.gov/factsheets/fentanyl.)

"The number of alcohol-induced deaths in the United States, which had been increasing gradually each year since 2000, rose sharply during the first year of the COVID-19 pandemic. After annual increases of 7 percent or less between 2000 and 2018, the overall age-adjusted rate of alcohol-induced deaths increased 26 percent from

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

2019 to 2020." (MHPAEA Report at 11(citing Spencer M.R., Curtin S.C., Garnett MF. (2022). Alcohol-induced death rates in the United States, 2019-2020. NCHS Data Brief, No. 448. https://www.cdc.gov/nchs/products/databriefs/db448.htm.)

41. The opioid crisis has and continues to destroy lives and devastate families and communities.[8] It is the deadliest drug crisis in United States history.[9]

42. Timely access to life-sustaining and life-saving treatment and continuing care for substance use and mental health disorders is critical to preventing these deaths and allowing people to achieve long-term recovery and to return to their families, friends and communities as healthy, productive and contributing members of society.[10] The MHPAEA Report highlights the role of timely access to quality care in addressing the MH/SUD crisis. (MHPAEA Report at 12 ("As with medical conditions and surgical treatment, mental health conditions and substance use disorders can be managed with timely and affordable access to quality care. Mental health conditions and substance use disorders that are left untreated can have devastating effects not only on the individuals experiencing them, but also on their families, friends, caregivers, communities, coworkers, students, patients, clients, and the behavioral health workforce.").)

---

[8] *See* Centers for Disease Control and Prevention, Understanding the Epidemic, retrieved on May 19, 2026 from https://www.cdc.gov/overdose-prevention/about/understanding-the-opioid-overdose-epidemic.html.

[9] *See* California Department of Public Health, Patterns of Opioid-Related Overdose Deaths in California, 2011-2017 (March 2019), retrieved on June 12, 2019 from https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/CDPH%20Document%20Library/Prescription%20Drug%20Overdose%20Program/Injury%20Data%20Brief%20Opioid%20Overdose%20Deaths%202011-2017_ADA.pdf.

[10] The human impact of the opioid epidemic – from babies born dependent, the emotional toll on individuals with a substance use disorder, and that of their families and communities, to the tens of thousands of lives cut short each year – has been tremendous. Now, reports show that the economic impact has been just as shocking, with the drug crisis costing the U.S. economy $1 trillion since 2001 and likely to cost the economy an additional $500 billion by 2020 if the current rates of addiction and overdose remain steady. See Altarum, Solutions to Advance Health: Economic Toll of Opioid Crisis in U.S. Exceeded $1 Trillion Since 2001 (February 13, 2018), retrieved on June 5, 2019 from https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

43. Addiction is recognized as a chronic, relapsing brain disorder characterized by compulsive drug seeking, continued use despite harmful consequences, and long-lasting changes in the brain. Addiction is considered both a complex brain disorder and a mental illness. Changes to the brain chemistry and function from addiction can be long lasting and can lead to many harmful, often self-destructive, behaviors. Addiction is the most severe form of a full spectrum of SUDs, and is a medical illness caused by repeated misuse of a substance or substances.[11] Without treatment and engagement in recovery activities, addiction is progressive and can result in unemployment, homelessness, disability, and premature death.

44. SUD treatment is difficult, and the challenges of recovery from addiction are many, which can involve cycles of recurrence and remission before long-term recovery is realized. Timely access to treatment and continuing care, including RTC, PHP, IOP and OP treatment, medication management, psychological testing, counseling and behavioral therapies, social support, and supportive sober living environments, are critical for people to recover from addiction and reclaim active and meaningful lives. Clinical laboratory services are recognized as an appropriate and important diagnostic procedure in SUD and mental health treatment as such services promote prevention, diversion, early detection, and lifelong recovery from addiction. Such testing is designed to provide accurate results that help physicians and treatment clinicians create a scientifically designed drug monitoring strategy for optimal treatment outcomes, which includes testing for

---

[11] *See* National Institute of Drug Addiction, The Science of Drug Use and Addiction: The Basics, retrieved on May 19, 2026 from https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction; *see also*, American Society of Addiction Medicine, Public Policy Statement: Definition of Addiction, retrieved on June 13, 2019 from https://www.asam.org/docs/default-source/public-policy-statements/1definition_of_addiction_long_4-11.pdf?sfvrsn=a8f64512_4.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

accurate prescription therapy and medication assisted treatment.[12]

45. Families and individuals purchase health insurance to help cover the costs of health care, including the costs of SUD and mental health treatment. Health insurance is supposed to provide people with peace of mind and security and provide them with access and options for life-sustaining and life-saving health care while preventing families and individuals from experiencing financial crises, such as bankruptcy or home foreclosure, or being forced to choose between paying for rent, utilities and food, or paying for necessary health care costs.

46. Traditionally, insurers and employers have covered treatment for mental health conditions, including a SUD, less favorably than treatment for physical health conditions, including higher cost-sharing obligations for patients, more restrictive limits on the number of inpatient days and outpatient visits, and more onerous prior authorization requirements. To address this unequal treatment, Congress first passed a mental health parity law in 1996, and many states followed suit in the following decade by passing laws of their own. Among other limitations, however, the 1996 act did not address the treatment of SUDs. Congress addressed this gap in passing the historic MHPAEA, 42 U.S.C. § 300gg-26, which, among other things, prohibits most plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., from imposing different treatment limits, cost-sharing and INN and OON coverage on mental health and SUD treatment than are imposed on other medical and surgical services. Furthermore, ERISA requires fiduciaries to act solely in the interests of plan participants and beneficiaries, and to decide claims for health care benefits in accordance with plan documents and under a full and fair procedure.

47. The Patient Protection and Affordable Care Act of 2010 ("PPACA"),

---

[12] *See* Clinical Guideline Committee (CGC) Members, The ASAM/AAAP Clinical Practice Guideline on the Management of Stimulant Use Disorder, retrieved on May 19, 2026 from https://pmc.ncbi.nlm.nih.gov/articles/PMC11105801/.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

42 U.S.C. §§ 18001, *et seq.*, also known as the Affordable Care Act or Obamacare, requires a range of health plans, both inside and outside of the exchanges, to provide a core package of essential health benefits including mental health and SUD services and laboratory services. 42 U.S.C. § 18022. The PPACA extends the impact of the MHPAEA so that many health plans must offer coverage for mental health and SUD services and laboratory services with at least an equal level of benefits as the plans offer for the treatment of medical and surgical benefits.

48. The MHPAEA Report further highlights the role of this important legislation in combatting the MH/SUD crisis:

> "The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act (MHPAEA) generally requires that group health plans and health insurance issuers offering group or individual health insurance coverage ensure that any financial requirements (such as coinsurance and copays) and treatment limitations (such as visit limits) that apply to mental health and substance use disorder (MH/SUD) benefits are no more restrictive than the predominant financial requirements or treatment limitations that apply to substantially all medical/surgical (M/S) benefits in a benefits classification. In addition, MHPAEA prohibits separate financial requirements or treatment limitations that apply only to MH/SUD benefits. These protections are intended to ensure that participants, beneficiaries, and enrollees seeking MH/SUD benefits do not face greater limitations on access to those benefits than are imposed on M/S benefits. These protections are vital for America's workers, health insurance consumers, and their families and caregivers." (MHPAEA Report at 1 (citing Pub. L. 110-343, 122 Stat. 3765, as amended by the Patient Protection and Affordable Care Act, Pub. L. 111-148, 12 Stat. 119, and the Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182; 21st Century Cures Act (Cures Act), Pub. L. 114- 255, 130 Stat. 1033, as amended by the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act (Support Act), Pub. L. 115-271, 132 Stat. 3894; 153 Cong. Rec. S1864–5 (daily ed. Feb. 12, 2007); H. Rept. 110–374, part 3 (Mar. 4, 2008), https://www.congress.gov/congressional-report/110th-congress/house-report/374 ("The purpose of H.R. 1424, the 'Paul Wellstone Mental Health and Addiction Equity Act of 2007' is to have fairness and equity in the coverage of mental health and substance-related disorders vis-a-vis coverage for medical and surgical disorders.").)

> "MHPAEA enforcement is essential to ensuring parity

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

> between access to covered MH/SUD benefits and covered M/S benefits. MHPAEA prohibits financial requirements and treatment limitations applicable to MH/SUD benefits that are more restrictive than the predominant financial requirements and treatment limitations that apply to substantially all M/S benefits. Examples of treatment limitations on MH/SUD benefits include day and visit limits, exclusions of specific treatments for covered mental health conditions or substance use disorders, disparate ways of determining reimbursement rates for MH/SUD providers as compared to M/S providers, plan practices that make it harder for MH/SUD providers to join a plan's network than the practices applied to M/S providers, and stricter prior authorization or medical necessity reviews for MH/SUD coverage. Reforming or removing impermissible limitations in accordance with MHPAEA helps to ensure that participants, beneficiaries, and enrollees have equitable access to MH/SUD benefits as compared to M/S benefits." (MHPAEA Report at 13.)

49. The MHPAEA Report highlights barriers that still prevent Americans—including those with insurance ostensibly covering such care—from receiving it:

> "Far too many Americans do not seek MH/SUD care because of cost, stigmatization associated with MH/SUD care, discrimination against those with mental health conditions and substance use disorders, local in-network provider shortages, geography, and other barriers. According to a survey that included data from 2021 and 2022, approximately one quarter of U.S. adults with frequent mental distress could not see a doctor due to cost. The same survey found that nearly 77 percent of U.S. adults with a substance use disorder needed but did not receive treatment." (MHPAEA Report at 12 (citing Mental Health America. (2024). The State of Mental Health in America, 2024. https://mhanational.org/wp-content/uploads/2024/12/2024-State-of-Mental-Health-in-America-Report.pdf)

> "[O]f the estimated 54.6 million people aged 12 or older needing substance use disorder treatment in 2022, only 24 percent actually received treatment. Among people aged 12 or older with an opioid use disorder, only 18.3 percent received medication-assisted treatment for opioid use." (MHPAEA Report at 12-13 (citing Substance Abuse and Mental Health Services Administration. (2023). Key substance use and mental health indicators in the United States: Results from the 2022 National Survey on Drug Use and Health (HHS Publication No. PEP23-07-01-006, NSDUH Series H-58). https://www.samhsa.gov/data/report/2022-nsduh-annual-national-report.)

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

> "DOL has uncovered troubling disparities within networks between the availability of MH/SUD providers and the availability of M/S providers, with results suggesting that, even where plans and issuers maintain robust networks on paper, in practice, these providers are not available to take new patients or may no longer be at the location or with the practice listed in the directory. Sometimes, network disparities reflect broader issues with the MH/SUD market compared with the M/S market, but too often they reflect coverage issues that impede access to MH/SUD care." (MHPAEA Report at 15.)

50. The MHPAEA Report highlights one such recent example of barriers to timely access to life-sustaining and life-saving treatment and continuing care for substance use and mental health disorders erected by Cigna Health and Life. In February 2024, an ERISA-covered Taft-Hartley multiemployer health plan (the "Fund") that contracted with Cigna Health and Life to provide in-network healthcare services to its participants and beneficiaries entered into a Settlement Agreement and Release with the United States Department of Labor, Employee Benefits Security Administration ("EBSA") to resolve EBSA's determinations "that the Fund failed to comply with ERISA § 712(a)(3), 29 U.S.C. § 1185(a)(3), with respect to the NQTL [nonquantitative treatment limitations], because (1) the Fund, through [Cigna Health and Life], uses different, non-comparable processes and evidentiary standards to evaluate the adequacy of its medical/surgical ('M/S') and mental health/substance use disorder ('MH/SUD') networks; (2) the Fund, through [Cigna Health and Life], does not respond comparably to identified deficiencies in its M/S and MH/SUD Networks; and (3) the Fund's own practices for addressing deficiencies in its Network are not applied comparably to M/S and MH/SUD benefits" and to address EBSA's "concern[s] about the adequacy of Cigna's MH/SUD Network and the Fund's disparate rate of out-of-network ('OON') utilization for MH/SUD services as compared to M/S services." (MHPAEA Report, Appendix A, at 1-2.)

## HEALTH BENEFIT PLANS AT ISSUE

51. The Defendants either fully insured or administered self-insured health

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

benefit plans for Plaintiffs' patients.

52. Based upon information and belief, Plaintiffs allege that the majority of the plans for the patients at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, are employer-provided plans governed by ERISA, and a minority of the plans are either individual and family plans obtained in the open market or through a national or state health insurance exchange, or employer-provided plans that fall within an exception to ERISA ("non-ERISA plans").

53. Each of the patients' health plans provided coverage for the SUD services Plaintiffs provided to each of the patients, including the 83 patients treated between March 1, 2022 and March 15, 2026, as mandated by state and federal law, including the PPACA that requires, among other things, insurers to provide benefits for essential mental health and SUD treatment and laboratory services, with no pre-existing condition exclusions and no annual or lifetime dollar amount limits on coverage of such treatment services, and the MHPAEA, an antidiscrimination statute intended to ensure that coverage for mental health and SUD treatment is in "parity" with coverage for medical and surgical care.

54. Because coverage for the SUD services Plaintiffs provided to each of the patients, including the 83 patients treated between March 1, 2022 and March 15, 2026, is mandated, the claims at issue do not implicate issues of coverage. Except for a minority of claims where Defendants concluded there was no medical necessity for a particular service within a given patient's course of treatment and therefore paid no benefits, the vast majority of claims at issue in this case involve Defendants' systematic refusal to pay the full amount of benefits owed. The claims at issue in this case are largely for services that Defendants verified, authorized, *and* paid (albeit at amounts less than they owed), which reflects the Defendants' acknowledgment that the claims are covered under the plans.

55. Defendants' under-reimbursement of OON SUD claims, including those submitted by Plaintiffs for the 83 patients treated between March 1, 2022 and

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

March 15, 2026, is rooted in their improper use of Medicare rates for different providers of different services to calculate the reimbursement rates for SUD services.

56. During the relevant time period, Medicare did not have rates for services provided by SUD treatment facilities like Plaintiffs, and thus there were no proper Medicare rates to price Plaintiffs' claims pursuant to the plan language.[13]

57. Cigna's management acknowledged in internal emails and memoranda that it was looking for ways to reduce the amount spent on OON SUD services because there existed no applicable Medicare rate and Cigna was therefore obligated to pay OON SUD claims at full billed charges or with a "usual, customary and reasonable" ("UCR") or "reasonable and customary" ("R&C") rate based on a percentile of charges by other SUD providers in the same geographic area.

58. Prior to 2015, Cigna had been reimbursing Plaintiffs' OON SUD claims at 100% of Plaintiffs' billed charges or with a reasonable and customary ("R&C") rate (which, amounted to, on average, 70-90% of the billed charges) (less any applicable insured cost-sharing amounts).

59. In 2015, Cigna changed its internal reimbursement policies to discontinue reimbursing OON SUD claims with billed charges or an R&C rate, and instead to reimburse OON SUD claims with inapplicable Medicare-based rates, which Cigna and MultiPlan arrived at by, among other things, cross-walking the healthcare billing codes on Plaintiffs' claim forms to codes used by Medicare for different providers of different services. Cigna and MultiPlan cross-walked the higher levels of care (DTX and RTC) to codes utilized by inpatient psychiatric hospitals, and cross-walked the lower levels of care (PHP, IOP and OP) to codes

[13] The California Department of Insurance concluded in its July 23, 2018 Order to Show Cause *In the Matter of the Certificate of Authority of Health Net Life Insurance Company* (CDI File No. UPA-2016-00005), that Medicare does not provide a rate for inpatient or outpatient SUD treatment provider charges and that substituting a bundled per diem Medicare rate for such treatment charges violates state and federal parity laws.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

utilized by skilled nursing facilities ("SNFs") and general behavioral health counselors. Cigna also referred claims to MultiPlan for repricing with Viant, which used Medicare charge data to reprice OON SUD facility claims, and Data iSight, which used Medicare cost data to reprice OON SUD professional claims. Cigna also instituted new drug testing policies to limit the number of tests that would be covered, despite the risk of death to its members if they are not tested regularly, and targeted OON SUD providers for arbitrary audits, pre-payment review, administrative claim denials, and incessant requests for documentation while claims were pended without payment.

60. Two historical events factored prominently in Cigna's changes to its internal coverage and OON reimbursement policies.

61. The first event was passage of the PPACA and the rollout of plans in 2014. The PPACA's mandate brought an influx of new premium dollars to Cigna's coffers, but also mandated coverage for essential health benefits, such as SUD treatment and laboratory services. While Cigna welcomed the premium dollars, it wanted an "out" from paying SUD claims, especially OON claims.

62. The second event was in 2015 when the sun set on a provision in a consent decree that Cigna and other insurers entered with the New York Attorney General to settle the *Ingenix* litigation.[14] Before MultiPlan, a company called Ingenix (owned by UnitedHealthcare) offered similar "services" in recommending lower insurance payments and shifting the cost to patients and providers. Ingenix was a database that Cigna and others used to generate artificially suppressed reimbursement rates. Prior to its expiration, the consent decree required the insurers

---

[14] New York State Office of the Attorney General, Cuomo Announces Industry-wide Investigation in Health Insurers; Fraudulent Reimbursement Scheme, Feb. 13, 2008: https://ag.ny.gov/press-release/2008/cuomo-announces-industry-wide-investigation-health-insurers-fraudulent (last visited September 15, 2024); Assurance of Discontinuance Under Executive Law§ 63(15), Jan. 13, 2009: https://static01.nyt.com/newsgraphics/documenttools/5d3c216164fe8ebd/0d3f6139-full.pdf (last visited September 15, 2024), *see e.g.*, ¶¶ 23, 28, 29.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

to abandon Ingenix and to fund and utilize the non-profit FAIR Health benchmark database for determining R&C rates based on charges of other providers of the same service in the same geographic area.

63. Facing a significant increase in "OON SUD spend" in 2015 and freed from FAIR Health mandated R&C rates after the expiration of the consent decree, Cigna turned to MultiPlan for an Ingenix-like solution that placed its own profits over its plan members' best interests. MultiPlan responded with its Viant and Data iSight databases. In creating and implementing this scheme, Cigna specifically referenced *Ingenix* and the need for a third party, like MultiPlan, to come up with a similar database to reprice OON SUD claims in an effort to shield Cigna from *Ingenix*-like liability.

64. Cigna's C-suite executives and the enterprise admit that there are no Medicare rates for SUD treatment services, yet they decided to crosswalk Plaintiffs' claims to inapplicable Medicare rates and utilized MultiPlan's database infected with Medicare rates for different providers of different services, all for Defendants' secret profits. Cigna's C-suite executives and the enterprise also admit that they created a "hit list" of SUD treatment providers and clinical laboratories for the SIU to stop claim payments on.

65. Cigna's internal email chain in April 2015 shows that Cigna was reimbursing OON SUD claims at full billed charges because it knew there is no Medicare rate for SUD services.

> Our problem is we're looking to Medicare rates to reimburse substance abuse. Since there are no Medicare rates for substance abuse, we've been reimbursing at billed charges.
>
> Most of the facility claims are still paying at billed charges. The issue here is there are no Medicare rates for substance abuse, so MRC pricing kicks back to billed charges.
>
> When it comes to labs, the enterprise is working on a coverage policy change around the number of tests allowed per screening as well as denying quantitative tests

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

> when a customer has a negative qualitative test.
>
> We got approval last week to move forward with the pilot to change the way we're reimbursing these labs, a change we estimated would have been worth over $6M in 2014 to IFP [individual and family plans] alone.

See Exhibit A.

66. In July 2015, Cigna complained about the amounts spent on OON SUD claims due to the lack of a Medicare rate and developed an action plan for how it would find a Medicare rate to use; how it would attempt to shield itself from *Ingenix*-like liability by using a third party to develop the logic for repricing claims with a Medicare rate; how it would accelerate the adoption of new internal policies and guidelines to support claim denials; and how, in the meantime, it would aggressively increase claim reviews and reduce the total number of claims, including by placing SUD providers on a "hit list":

> Medicare edit for IOP and PRT at risk due to lack of codes utilized by Medicare, however researching potential workaround with vendor (Missing value approach).

See Exhibit B.

> SIU [special investigations unit] is looking at opportunities to increase staffing … to more aggressively address claim and facility reviews and manage appeals and push back.
>
> Operations is looking at the opportunity to ramp up the UM [utilization management]/concurrent review processes for Intensive Outpatient services – including increased record requests and also pre-payment claim and record reviews.
>
> Clinical Policy — Dr. Lustig (Dr. Josephs) to follow up with Dr. Kessel to understand if we can accelerate the introduction of enhanced clinical policies to support denials / editing of claims.
>
> SIU / Legal — Eva to follow up with Matt Norton and Legal to see if we can be more aggressive on stopping payment.
>
> Cigna is paying these out of network outpatient centers 100% billed charges because we do not have a "medicare [sic] equivalent"
>
> We cannot develop these charges internally (think of when

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

> Ingenix was sued for creating out of network reimbursements).
>
> We need someone (external to Cigna) to develop acceptable Medicaid or otherwise acceptable charges (like Milliman).

See Exhibit C

> Next Steps [] FL and CA [] Create a hit list for OON facilities.

See Exhibit D

67. By August 2015, Cigna was already patting itself on the back about the reductions in paid OON SUD claims attributed to its change in policies.

> For this week, we're on pace for nearly a 90% reduction in paid claims compared to just 2 weeks ago. But we're not out of the woods yet.

See Exhibit E

68. In November 2015, Cigna touted that it had reduced the amount paid on OON IOP claims from $13.6 million in June to $3 million in August, a 78% reduction in just two months of aggressively denying and under-reimbursing OON SUD claims. See Exhibit F. That drastic reduction also meant a significant increase in Cigna's cost containment fees. Cigna seized this path to greater profitability with a conscious disregard for the care and best interests of its members.

69. Cigna's myCigna Legal Disclaimer represents to the public that Cigna uses the FAIR Health database, not Viant. Moreover, knew at all times there is no Medicare rate for Plaintiffs' OON SUD services and that Cigna cross-walked Plaintiffs' billing codes to Medicare codes that are not utilized by SUD treatment facilities or applicable to SUD claims.

70. Cigna's myCigna Legal Disclaimer that explains when there is no comparable Medicare rate for an OON service, "the MRC is determined based on the lesser of [] the health care professional or facility's normal charge for a similar service or supply; or [] the MRC Option I methodology based on the 80th percentile of billed charges [i.e., an R&C rate]."

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

**Defendants' Reimbursement Methodologies at Issue**

71. Regardless of plan type, the Cigna Summary Plan Descriptions ("SPDs") at issue in this case contain one of two different methodologies to reimburse OON claims like those submitted by Plaintiffs on behalf of the 83 patients at issue, and under either methodology, Defendants were obligated to reimburse Plaintiffs' claims at either their full billed charges or with an R&C rate.

72. Cigna terms these reimbursement methodologies as the "Maximum Reimbursable Charge" ("MRC").

73. The Cigna SPDs at issue involve either MRC 1 or MRC 2 plans.

74. Although some of the plans may vary in the precise words used, they are identical in all material terms that relate to these two reimbursement methodologies, and Defendants' claims processing systems only recognize these two methodologies.

75. Additionally, when MultiPlan prices claims for Cigna, MultiPlan does not possess the member's plan and only knows if the member's plan has an MRC 1 or MRC 2 reimbursement methodology.

**MRC 1:**

76. For shorthand, Defendants refer to the MRC 1 reimbursement methodology as providing an R&C rate.

77. Under MRC 1 plans, Defendants were supposed to reimburse Plaintiffs' claims at the lesser of the provider's normal charge for a similar service or supply, or a percentile of charges made by providers of such service or supply in the geographic area where the service is received that are compiled in a database that Cigna has selected.

78. The databases that Cigna employed through MultiPlan use Medicare rates for different providers of different services, which are neither Plaintiffs' normal charges nor a percentile of other SUD providers' charges in the same geographic area, which is inconsistent with the plan language and with Cigna's

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

representations to its members that the database it uses to price OON claims is FAIR Health.

79. Cigna was obligated to reimburse Plaintiffs' claims under MRC 1 plans either at Plaintiffs' normal charges or at an R&C rate.

**MRC 2:**

80. For shorthand, Defendants refer to the MRC 2 reimbursement methodology as providing a "Medicare-like" rate.

81. Under MRC 2 plans, Defendants were supposed to reimburse Plaintiffs' claims at the lesser of the provider's normal charge for a similar service or supply, or a percentage of a schedule that Cigna has developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for similar services within the geographic market.

82. Cigna represents to its members that when a Medicare-based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the reimbursement rate is determined based on the lesser of the health care professional or facility's normal charge for a similar service or supply, or with the same R&C rate as calculated under the MRC 1 plans.

83. The databases that Cigna employed through MultiPlan use Medicare rates for different providers of different services.

84. Using a Medicare rate from a different provider of a different service is not Plaintiffs' normal charge, and simply using that Medicare rate is not employing a methodology similar to a methodology utilized by Medicare, as Cigna represents in its plan.[15] Furthermore, given that Plaintiffs are not Medicare providers and Cigna acknowledged in its own internal emails and memoranda that there are no Medicare rates for SUD treatment facilities, Cigna should have reimbursed Plaintiffs' claims

[15] See *Plastic Surgery Center, P.A. v. Cigna*, 2021 WL 1686772, at *6-7 (D.N.J, Apr. 29, 2021).

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

at Plaintiffs' billed charges or with an R&C rate.

85. Cigna was obligated to reimburse Plaintiffs' claims under MRC 2 plans either at Plaintiffs' normal charges or at an R&C rate.

**Defendants' Financial Conflict of Interests**

86. As a plan administrator Defendants are fiduciaries required to act in the best interests of the plan and its beneficiaries. While Cigna is legally obligated to act solely in the best interest of its health plan members and pay what is owed on a claim under the terms of the applicable plans, Cigna does not do so because it is laboring under a financial conflict of interest. Indeed, not only does proper reimbursement eat into Cigna's bottom-line, affecting its stock price, but Cigna has also set up a structure where it stands to profit, not just save, the more it underpays healthcare providers.

87. Cigna has a structural and inherent conflict of interest in situations where it fully insures the plan, makes the benefit determinations, and funds the benefits. On the one hand, Cigna is responsible for administering the plan so that those who deserve benefits receive them. On the other hand, Cigna has an incentive to pay as little in benefits as possible to plan participants because the less money Cigna pays out, the more money it retains in its own coffers.

88. When Cigna only serves as the plan administrator for self-funded, employer-sponsored ERISA plans, it has a different conflict of interest based upon the terms of the ASAs with the employer-sponsor. Pursuant to the ASAs, Defendants are compensated in two ways: (1) Cigna receives a per-member/per-month ("PMPM") fee based on historical claims data that is intended to approximate the monthly average cost of administering the plan; and (2) Cigna receives an additional "cost containment" fee generally calculated as 27 to 29% of the "net savings," which is the difference between the amount billed by the provider and the amount paid by Cigna.

89. Cigna created a symbiotic system where both Cigna and the third-party

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

it used to "reprice" claims using inapplicable Medicare rates—MultiPlan—directly benefitted financially by under-reimbursing healthcare providers. Cigna earns its cost containment fees by, among other things, funneling claims to MultiPlan to "re-price" its insured's claims. MultiPlan created the Viant and Data iSight databases that Cigna utilized to "reprice" and reimburse Plaintiffs' SUD claims with an artificial R&C rate based on inapplicable Medicare rates for different providers of different services. Just like Cigna earns a fee based on "net savings," Cigna rewards MultiPlan with a fee of 9-12% of the difference between the amount the healthcare providers billed and the amount paid under the plan. The cost containment fees that Cigna and MultiPlan take are not based in any way on the accuracy of their pricing determinations; those fees are based exclusively on the amount by which their pricing determinations undercut healthcare providers' billed amounts. In short, the cost containment fees and the agreements between Cigna and MultiPlan do not reward pricing accuracy or fidelity to the plan terms and the best interests of the plan members; to the contrary, they incentivize Defendants to price claims as low as possible regardless of how inaccurate those pricing determinations may be and regardless of the harm those determinations will cause to plan members and the health care providers who serve them.

90. Cigna receives a fee for slashing Plaintiffs' bills that is nearly double what Cigna paid to Plaintiffs for providing the SUD treatment, and Cigna rewards MultiPlan with a fee—half of what Plaintiffs were paid—for simply generating the flawed reimbursement rates supporting Cigna's scheme.

**91.** Defendants have a financial conflict of interests, since the less they pay to providers like Plaintiffs, the more of a fee they take. One court recently concluded that "[t]he percentage of fees that Cigna receives in exchange for its cost containment program gives rise to a certain 'degree of skepticism,' as it could incentivize Cigna to under-reimburse claims in order to earn a higher percentage of savings." *TML Recovery, LLC v. CIGNA Corp.*, No. SA CV 20-00269-DOC (ADS),

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

2024 U.S. Dist. LEXIS 75966, at *37 (C.D. Cal. Mar. 18, 2024) (cit. omitted). The Court concluded "that a conflict of interest exists regarding plans using Cigna's cost containment program. '[W]hen reviewing a discretionary denial of benefits by a plan administrator who is subject to a conflict of interest, we must determine the extent to which the conflict influenced the administrator's decision and discount to that extent the deference we accord the administrator's decision.' *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008)." *TML Recovery*, 2024 U.S. Dist. LEXIS 75966, at *38.

**CIGNA AND MULTIPLAN ARE UNDER FEDERAL INVESTIGATIONS**

92. Cigna and other commercial health insurers' use of MultiPlan's repricing tools has had a far-reaching impact on healthcare providers beyond just these Plaintiffs. Cigna and MultiPlan are bad for the American healthcare system and bad for Americans, especially those in need of mental health and SUD treatment.

93. On February 2, 2024, United States District Court Judge David O. Carter of the Central District of California unsealed virtually all of Cigna and MultiPlan's documents in the consolidated OON SUD provider action *TML Recovery , et al. v. Cigna, et al. ("TML Action"),* finding that, "[a]s this case concerns health insurance and healthcare providers, matters of widescale public concern, these documents are likely to be of interest to many individuals besides Defendants' competitors. The Court therefore finds the public interest in access here strong." *TML Recovery, LLC v. CIGNA Corp.*, 714 F. Supp. 3d 1214, 1221 (C.D. Cal. 2024).

94. Once the documents Cigna and MultiPlan fought hard to conceal from the *TML Action* plaintiffs, the court, and the public were unsealed, The New York Times published three articles in its Sunday edition, on April 7, 2024.[16] The public

[16] Copies of these articles are attached hereto as Exhibit G and linked below.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

shock and outrage over Cigna and MultiPlan's conflict-infected scheme to enrich themselves at the expense of American patients and employees were immediate, and the initiation of governmental investigations was swift.

95. On April 9, 2024, the American Hospital Association wrote a letter to the Honorable Julie A. Su, Acting Secretary, DOL, summarizing *The New York Times* articles, and demanding that the DOL "immediately open an investigation into these practices and hold companies like MultiPlan and its corporate commercial insurer partners to account for these unconscionable practices, distorted incentives, potential violations of ERISA, and ultimately, harms to American patients and employees."

> When patients receive care from providers outside their insurance plans' networks, large commercial insurers send the bills to MultiPlan to recommend a payment amount. But MultiPlan and the insurers are strongly incentivized to keep the payments low because their fees increase when the reimbursements decrease. Specifically, their revenues are based on the difference between the original bill and the amount the insurer actually pays, so these giant corporate entities have every reason to pay far less than what they should. Remarkably, the fees paid to commercial insurers and MultiPlan are often far higher than the reimbursement for the health care itself. …
>
> As a result of these secretive arrangements, America's employees are forced to pay increasing out-of-pocket amounts — even though they already pay hundreds of dollars each month for employer-funded health insurance.

---

"*Health Insurers' Lucrative, Little-Known Alliance: 5 Takeaways*" - a private-equity-backed firm has helped drive down payments to medical providers, drive up patients' bills and earn billions for insurers, *The New York Times*, Chris Hamby, April 7, 2024, https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills-takeaways.html;

"*In Battle Over Health Care Costs, Private Equity Plays Both Sides*" – as medical practices owned by private equity firms fuel overbilling, a payment tool also backed by such investigators helps insurers boost their profits, *The New York Times*, Chris Hamby, April 7, 2024, https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills-private-equity.html;

"*Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*" – a little-known data firm helps health insurers make more when less of an out-of-network claim gets paid. Patients can be on the hook for the difference, The New York Times, Chris Hamby, April 7, 2024, https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html.

> … Health care providers are forced to endure these below-cost reimbursements, and employers with self-funded plans report that insurance companies are charging them unpredictable and frequently large processing fees without transparency about claims practices or data analytics, making it difficult for them to police or understand these inappropriate practices.[17]

96. On April 29, 2024, U.S. Senator Amy Klobuchar wrote a letter to the Honorable Jonathan Kanter, Assistant Attorney General, Antitrust Division, U.S. Department of Justice ("DOJ"), and the Honorable Lina M. Khan, Chair, Federal Trade Commission ("FTC"), encouraging them "to investigate the use of algorithms that collect and process data in the out-of-network insurance payment industry to determine payments for physicians and out-of-pocket costs for patients to determine whether any of this conduct violates the law."

> Recent reporting has indicated that firms may be using algorithmic tools to undermine competition and push additional costs onto patients that receive healthcare out of their insurance network. The New York Times reported on one such firm, MultiPlan, which sells data to help insurance companies determine how much they should pay providers for out-of-network medical care, and how much of that cost is passed directly to patients. … I am concerned that—rather than competing for business from employers by reducing these costs to employees—algorithmic tools are processing data gathered across numerous competitors to subvert competition among insurance companies. The result is that—instead of competing with each other—insurance companies are pushing additional hidden costs on to employees and patients.
>
> In 2009, a settlement agreement with the New York Attorney General required health insurers to shift out-of-network pricing decisions to a non-profit entity. But this provision lasted only five years. … Freed from the constraints of the settlement, MultiPlan has now positioned itself as a central hub that gathers out-of-network payment data across the industry and uses algorithmic tools to process this data to recommend artificially low payments to physicians potentially at the

---

[17] Attached hereto as Exhibit H is a copy of the American Hospital Associations' April 9, 2024 Letter to Dep't of Labor, https://www.aha.org/system/files/media/file/2024/04/Following-NYT-Investigation-AHA-Urges-DOL-to-Investigate-Actions-of-MultiPlan-and-Commercial-Insurers-letter.pdf



ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

> expense of employees or patients. … MultiPlan reportedly collects fees commensurate with how little its insurance-company clients pay to doctors. In other words, the more money MultiPlan forces patients to pay for out-of-network care, the more money it makes.[18]

97. On April 18, 2024, the DOJ, FTC and the U.S. Department of Health and Human Services ("HHS") launched an online portal for the public to report health care practices that may harm competition,[19] and on May 9, 2024, the DOJ announced the formation of the Antitrust Division's Task Force on Health Care Monopolies and Collusion ("HCMC") to "identify and root out monopolies and collusive practices that increase costs, decrease quality and create single points of failure in the health care industry."[20]

98. On May 22, 2024, U.S. Senator Bernard Sanders, Chairman, Committee on Health, Education, Labor and Pensions ("HELP"), and Senator Ron Wyden, Chairman, Committee on Finance, sent a letter to MultiPlan's President and CEO, asking that he brief the Committee staff about the details of *The New York Times* investigation concerning practices that "often dramatically reduces plan payments for out-of-network services and leaves patients with sky-high medical bills that they are on the hook for paying."

> We are concerned that your company's Data iSight product improperly drives up patient health care costs and, further, that the financial incentives built into the fee for the use of the Data iSight product result in an improper conflict of interest between determining a plan's liability for out-of-network claims and the plan's duty to provide promised benefits pursuant to ERISA.

---

[18] Attached hereto as Exhibit I is a copy of Senator Klobuchar's April 29, 2024 Letter to Federal Trade Comm'n and Dep't of Just. https://static01.nyt.com/newsgraphics/documenttools/1d00c48c7634f677/0d0d8490-full.pdf

[19] Attached hereto as Exhibit J is a copy of the Fed. Trade Comm'n's Press Release, https://www.ftc.gov/news-events/news/press-releases/2024/04/federal-agencies-launch-portal-public-reporting-anticompetitive-practices-health-care-sector

[20] Attached hereto as Exhibit K is a copy of the Dept. of Just.'s Press Release, https://www.justice.gov/opa/pr/assistant-attorney-general-jonathan-kanter-announces-task-force-health-care-monopolies-and

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

> … According to recent reporting, your company's business model is to work as a go-between, negotiating what rates are paid to providers as promised under the group health plan and taking as a fee a specified percentage of any savings to the health insurer. In the early 2000s, it appears your company negotiated with health care providers to reach these rates, but now through the Data iSight product, appears to use an opaque process to set recommended payments for out-of-network services. Because your company is paid more when it reaches lower payment amounts, the payments to health care providers are often far lower than the billed amount, with some describing these amounts as "crazy low." When the plan is only willing to pay this low amount, patients are on the hook for the remaining bill, which in extreme cases can total hundreds of thousands of dollars.[21]

99. On August 20, 2024, U.S. House Representative Robert C. "Bobby" Scott, Ranking Member, U.S. House of Representatives Committee on Education and the Workforce, and Representative Mark DeSaulnier, Ranking Member, Subcommittee on Health, Education, Labor, and Pensions, wrote a letter to the Honorable Lisa M. Gomez, Assistant Secretary, DOL, EBSA, "request[ing] information regarding efforts of [EBSA] … to address troubling practices of certain group health plan service providers."

> Recent reports—including a front-page investigation by The New York Times regarding a company known as MultiPlan—have drawn attention to practices that negatively impact workers, employers, and health care providers. As leaders of the Committee on Education and the Workforce (Committee), we are committed to working with the Department to address these issues.
>
> … [ERISA] requires plan fiduciaries to monitor the practices of service providers who contract with employee benefit plans to ensure that all fees paid are reasonable. …
>
> … The recent findings of The New York Times regarding MultiPlan—a private equity-backed data analytics company that serves many ERISA-covered group health

---

[21]Attached hereto as Exhibit L is a copy of Senator Sanders and Senator Wyden's May 22, 2024 Letter to MultiPlan on behalf of Senate HELP Committee, https://www.finance.senate.gov/imo/media/doc/052224_wyden_sanders_multiplan_data_isight_letter.pdf

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

> plans—showed that the company profits from lower provider reimbursements that shift costs to consumers, while ultimately increasing compensation for itself and third-party administrators (TPAs). Rather than deliver meaningful savings to workers and employers, the investigation found that lower reimbursements for providers yielded higher fees to MultiPlan and TPAs and cut into employers' presumed savings, while patients were frequently liable for burdensome balance bills. …. Not only are consumers left responsible for these exorbitant out-of-pocket costs—despite having health insurance—employers in many cases also pay even more in fees to insurers and MultiPlan than the reimbursements paid to health providers.
>
> We are encouraged by the actions taken by DOL to date. … Further, according to the Department itself, DOL has "'a number of open investigations' into the type of pricing services MultiPlan provides."[22]

100. Representatives Scott and DeSaulnier referenced the DOL's "number of open investigations." At least one of those DOL investigations involves Cigna.[23]

**EXHAUSTION REQUIREMENT NOT APPLICABLE AND WAS OTHERWISE FUTILE**

101. As assignees, Plaintiffs were entitled to pre-litigation notice from Defendants of all mandatory plan appeal procedures, deadlines, and exhaustion requirements (*see* fn. 3, supra).

102. Plaintiffs were also entitled to pre-litigation notice from Defendants of all anti-assignment provisions.

103. However, Defendants did not provide Plaintiffs with the required pre-

---

[22] Attached hereto as Exhibit M is a copy of the House Committee on Education and the Workforce's August 20, 2024 Letter to EBSA, https://democrats-edworkforce.house.gov/imo/media/doc/scott_desaulnier_letter_to_dol_re_multiplan.pdf

[23] Moreover, Plaintiffs are informed and believe, and based thereon allege, that Cigna did not just profit from Americans' suffering during the opioid epidemic—they actively contributed to the healthcare crisis. Through Express Scripts, Cigna facilitated the distribution of addictive painkillers across America for profit. https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html. And as if all of this weren't enough, Cigna is now positioning itself as a creditor to claim a share of the Purdue Pharma (maker of the prescription opioid OxyContin) bankruptcy. *See In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.).

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

litigation notice of any exhaustion requirements or anti-assignment provisions.

104. Defendants' explanation of payment forms ("EOP") sent to Plaintiffs with the inadequate claim payments did not include the requisite notice of legal rights, including the right to an appeal, as required by ERISA.

105. During VOB calls, Defendants discussed details of the plans with Plaintiffs, but Defendants never informed Plaintiffs of any anti-assignment or exhaustion provisions in the plans, and in fact Defendants represented they would accept assignments, and Defendants paid Plaintiffs directly in recognition of these assignments (albeit at grossly reduced rates).

106. Because Defendants failed to provide Plaintiffs with the required pre-litigation notice of any exhaustion requirements or anti-assignment provisions, any plan exhaustion requirements and anti-assignments were waived or rendered inapplicable by Defendants' failure to properly advise Plaintiffs of the same.

107. Defendants' failure to provide meaningful access to applicable review procedures authorizes the district court to "excuse[] the requirement [to] exhaust . . . administrative remedies before filing suit." *Cromer-Tyler v. Teitel*, 294 F. App'x 504, 508 (11th Cir. 2008) (finding exhaustion excused because the plan administrator's letter informing the participant that her benefits under the plan were terminated was inadequate; it did not contain a specific reason for the determination, did not refer to specific plan provisions, and did not describe procedures necessary to review the claim); *see also Brand Tarzana Surg. Inst. v. Aetna Life Ins. Co.*, 541 F. Supp. 3d 1031, 1036-1037 (C.D. Cal. 2021) (finding that "inadequate notice excuses a party from its obligations to exhaust its administrative remedies"); *UnitedHealthcare*, 2023 WL 2808747, at *21-23 (denying insurer's exhaustion arguments on summary judgment).

108. Nevertheless, once Defendants implemented the arbitrary changes to their internal reimbursement policies in 2015 as discussed above, Plaintiffs attempted to appeal their claims through Defendants' internal processes, appealing

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

to Cigna and to MultiPlan, but Defendants denied the appeals, contending that no additional benefits were owed and that Plaintiffs' claims were properly reimbursed. Any further efforts at appealing Defendants' benefit determinations were futile.

109. Appealing Defendants' benefit determinations was futile because the same financial conflict of interest that motivated Cigna to enlist MultiPlan in a scheme to underpay Plaintiffs' OON SUD claims in the first place continued unabated. Thus, Defendants had no incentive to pay more on claims during the appeals process due to their continued financial conflict of interests. Paying what they owed on a claim that was appealed would have forced Defendants to dig into their own pockets and forfeit their cost-containment fee, which they were unwilling to do.

**LEGAL EFFECT AND CONSEQUENCES OF DEFENDANTS' SCHEME**

110. Defendants' conduct at issue herein has had a severe and adverse effect on not only Plaintiffs, but also Defendants' insureds and the SUD treatment profession as a whole. Defendants' conduct has placed in jeopardy the lives of their insureds that are struggling with addiction, exposing the insureds and their families to significant financial and health risks, while simultaneously destroying or significantly damaging Plaintiffs and all similarly situated SUD treatment providers.

111. Defendants' conduct breached agreements with Plaintiffs that arose when Plaintiffs' patients assigned benefits to Plaintiffs in writing, and when Defendants confirmed OON SUD coverage for the treatment and services at issue herein and promised to pay Plaintiffs for said treatment and services, and when necessary, Defendants gave prior approval and authorization for the SUD treatment and services that Plaintiffs provided to Defendants' insureds/members. Defendants violated the implied covenant of good faith and fair dealing in said insurance contracts, rendering their actions in bad faith.

112. Upon information and belief, Plaintiffs allege that Defendants' conduct was wanton and willful, and undertaken to improve their balance sheets by placing

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

profits over patients in a life and death situation. In this regard, Defendants' SUD treatment and clinical laboratory guidelines, reimbursement policies and claims handlings processes and procedures were, and are, fraudulently flawed and tainted by Defendants' financial interests.

113. Defendants' practices were similarly unfair, fraudulent and unlawful under state and federal law in that they violated the MHPAEA, while simultaneously constituting common law bad faith. The MHPAEA is an antidiscrimination statute intended to ensure that coverage of mental health and SUD treatment is in "parity" with coverage of medical and surgical care. Defendants, and each of them, have systematically treated Plaintiffs and other similarly situated OON SUD treatment providers differently than medical and surgical providers in California, and likely across the nation.

114. Defendants' practices were also unfair, fraudulent and unlawful under state and federal law in that they violated the PPACA, which requires, among other things, insurers to provide benefits for essential mental health and SUD treatment and laboratory services, with no pre-existing condition exclusions and no annual or lifetime dollar amount limits on coverage of such treatment services.

115. Defendants, and each of them, never intended to provide the coverage mandated by the plans at issue and instead intended to not pay or to underpay SUD treatment providers and laboratories throughout California, including Plaintiffs, and despite the providers' legal status as assignee of the insured's benefits. Defendants, and each of them, have ignored Plaintiffs' efforts to recover payment for the treatment and services provided, placing Plaintiffs in the untenable position of being forced to file this lawsuit in order to recover payments due under the law and plans, and in accordance with Defendants' OON coverage representations and payment promises to Plaintiffs.

116. Plaintiffs seek relief under their direct rights, written assigned rights from patients cheated out of their insurance benefits by Defendants, and as third-

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

party beneficiaries of their patients' health insurance plans issued, managed and/or administered by Defendants.

117. Defendants have also tortiously breached the implied covenant of good faith and fair dealing in the underlying health insurance plans issued, managed and/or administered by Defendants, which rights have been assigned to Plaintiffs.

118. The treatment and services at issue were provided by Plaintiffs to patients who at all relevant times had health insurance for the SUD treatment and services that Plaintiffs provided, and the health insurance plans were issued, managed and/or administered by Defendants, and each of them, or at the direction and under the control of Defendants.

119. Defendants, and each of them, caused the events complained of herein to occur throughout the State of California, and likely across the nation.

120. Plaintiffs provide SUD treatment to individuals in the process of recovering from alcoholism and SUDs. Plaintiffs' treatment includes a range of services, including, but not limited to, RTC, PHP, IOP, OP, detoxification, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and other services.

121. Defendants, and each of them, developed and marketed the subject health insurance plans to include coverage for SUD treatment and laboratory services provided to their insureds by INN providers and OON providers, like Plaintiffs.

122. The health insurance plans issued, managed and/or administered by Defendants, and each of them, are industry standard indemnity health insurance contracts that provide richer benefits (less out-of-pocket expense for insureds) for treatment and services that are obtained from INN providers. Such providers contract with Defendants to become part of their "network" and generally agree to

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

accept a set reduced rate of reimbursement in exchange for Defendants' steerage of patients to their practices or facilities and payment within specified contractual timeframes.

123. The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide for a reimbursement rate for OON services at a lesser percentage of the overall billed charges than the 100% reimbursement rate for INN services, less the insured's copayment, coinsurance and deductible, generally resulting in greater out-of-pocket expenses for Defendants' insureds.

124. California law requires that the policy forms, such as those utilized in the health insurance plans issued, managed and/or administered by Defendants, and each of them, be filed with and approved by the California Department of Insurance ("CDI"), and are generally not to be withdrawn from the insurance marketplace without an insurer meeting specific conditions.

125. The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide coverage for, but not limited to, the following OON SUD treatment and services: RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

126. The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide for the payment of services with an INN provider at 100% of the provider's billed charges set by contract, less the insured's copayment, coinsurance and deductible. Services with an OON provider are reimbursed at a lesser percentage of the provider's billed charges.

127. The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide that Defendants are required to remit claim payments to providers when the insured assigns his or her benefits to the provider in

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

writing, and Defendants warranted, represented and promised Plaintiffs that payments would be made to Plaintiffs.

128. When required by the health insurance plans issued, managed and/or administered by Defendants, and each of them, Plaintiffs' standard operating procedure was to obtain prior authorizations from Defendants for the SUD treatment and services to be rendered. Plaintiffs' standard operating procedure also included obtaining a verification of benefits from Defendants to ensure the patient is covered by the insurer and that the treatment and services at each level of care are covered benefits under the plan. Defendants' members/insureds were not admitted for treatment and services with Plaintiffs, and each of them, until the verification of benefits, prior authorizations, when needed, and payment promises were confirmed and acknowledged by Defendants.

129. In communications with Plaintiffs, including telephone calls requesting verification of benefits and preauthorization, Defendants, and each of them, represented to Plaintiffs that the services provided to Defendants' insureds were covered and that the OON benefits paid by Defendants to OON providers, like Plaintiffs, for all levels of SUD treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

130. Specifically, for each of the patients whose treatments and services are at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, Plaintiffs contacted Defendants by phone and/or in writing before beginning such treatments and services. Defendants confirmed with Plaintiffs that the patients, and each of them, were validly covered by plans issued, managed and/or administered by Defendants, and Plaintiffs advised Defendants of the planned OON treatments and services for Defendants' insureds, including the specific types of treatment and services to be provided, the treatment duration, billing codes and rates

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

for the same. Defendants were also put on notice that Plaintiffs were the assignees of the patient insureds. Defendants represented, warranted and promised to Plaintiffs that the OON benefits paid by Defendants to OON providers, like Plaintiffs, for all levels of SUD treatment and laboratory services, is a percentage of the covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Thereafter, Plaintiffs treated and provided the subject treatment and services to Defendants' insureds/members.

131. Based upon the language of the health insurance plans issued, managed and/or administered by Defendants, and each of them, and upon obtaining verifications of benefits, prior authorizations and payment promises from Defendants, and valid written assignments from the patients, Plaintiffs and its patients insured by Defendants, including the 83 patients treated between March 1, 2022 and March 15, 2026, reasonably expected that Plaintiffs' claims would be paid promptly and consistent with the law and the terms of the plans and/or the herein payment representations and promises that Defendants, and each of them, made to Plaintiffs.

132. Notwithstanding the verifications of benefits, prior authorizations, coverage representations by Defendants, payment promises by Defendants, and valid written assignments, Plaintiffs' claims for the majority of the SUD treatment provided to Defendants' insureds/members have not been paid properly and require substantial interest payments for violation of the applicable health plans, ERISA and California laws and regulations providing for the prompt payment of claims.

133. Plaintiffs are entitled to payment for the SUD treatment and services provided to Defendants' insureds/members at the proper reimbursement rates, pursuant to the plan documents, valid written assignments from their patients and pursuant to Defendants' coverage representations and payment promises to

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

Plaintiffs.

134. While the breaches alleged herein involved health insurance plans issued, managed and/or administered by one or more of the Defendants and Defendants' coverage representations and payment promises to Plaintiffs, each Defendant, upon information and belief, conceived, directed, approved, or aided and abetted the others in this bad faith scheme.

135. In California, a health insurer must provide or arrange for the provision of access to health care services in a timely manner. Most health insurers, including Defendants, and each of them, seek to satisfy this duty by providing an adequate network of INN providers for their insureds to choose from so they may receive the necessary treatment at the lowest expense to the insurer and the insured.

136. A "network gap" or "network insufficiency" exists in a health insurer's network when either the health insurer, or the patient, is unable to secure the services of an INN provider for necessary treatment. If a network gap exists, California law requires the insurer to secure the services of an OON provider so the insurer can meet its legal and contractual obligations to provide or arrange for the provision of access to health care services in a timely manner. In addition, emergency services, and sometimes urgently needed services, must be covered by an insurer with an OON provider if the insurer has no INN provider to provide the needed services.

137. California law does not give a health insurer the right or ability to unilaterally set the price it will pay an OON provider that provides services to one of the insurer's insureds in order to fill a network gap.

138. Upon information and belief, Defendants had a network gap with respect to SUD treatment providers and laboratories in California, and across the nation, to serve the tremendous number of insured patients in need of such treatment and services, due in large part to the opioid and addiction epidemic in California, and across the nation.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

139. Upon information and belief, Defendants had a network gap with respect to SUD treatment providers and laboratories required to treat and meet the needs of their insureds/members, which caused some of Defendants' insureds to obtain their needed treatment and services with OON providers, like Plaintiffs.

140. In the health care industry, a "verification" of an insured's coverage for the contemplated treatment, or an "authorization" for such treatment, is understood by both the insurers and providers (and the law) to be an agreement by the insurers to pay for such treatment. For INN providers, it is an agreement by the insurers to pay those providers based on previously negotiated rates between the insurer and those providers. For OON providers, it is an agreement by the insurers to pay those providers at their fully billed charges.

141. Plaintiffs, as OON providers, after obtaining verifications of benefits and prior authorizations from Defendants, provided life-saving and medically necessary SUD treatment and services to Defendants' insureds/members due to a network gap, and therefore, Plaintiffs are entitled to recover payment for their treatment and services at their fully billed charges.

142. While Plaintiffs have repeatedly demanded payment in full for the treatment and services provided to Defendants' insureds, Defendants, and each of them, have denied, delayed and incorrectly issued payment for Plaintiffs' claims even after requested records were copied, sent and received by Defendants.

143. Defendants, and each of them, would respond to Plaintiffs' inquiries about the delay or errors in payment with false promises that payment would be made and/or a multitude of excuses. Regardless of the excuses made by Defendants, and each of them, Plaintiffs did not receive proper claim payments for the covered SUD treatment and services provided to Defendants' insureds/members.

144. Upon information and belief, Defendants, and each of them, realized an immediate positive financial impact as a result of their misconduct alleged herein, cessation of SUD treatment and laboratory claims payments, and forcing treatment

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

providers, like Plaintiffs, through an expensive, administratively burdensome and indiscriminate audit, and not paying claims that are due and owed.

145. Upon information and belief, Defendants, and each of them, undertook the actions alleged herein with the intent and designed purpose of not paying claims that are due and owed under the law and the plans, and in accordance with Defendants' coverage representations and payment promised to Plaintiffs, as part of a pattern and practice by Defendants, and each of them, that is unlawful, unfair and fraudulent, and thus violates, *inter alia*, state and federal regulations and ERISA, MHPAEA and PPACA.

146. Upon information and belief, Defendants, and each of them, developed a mechanism through their superior economic might to oppress SUD treatment providers, including Plaintiffs, and force Plaintiffs and other treatment providers into a position where they can no longer afford to accept patients insured by Defendants, or with health plans managed and/or administered by Defendants. Defendants' misconduct as alleged herein has resulted in significant and undue hardship to Plaintiffs (and the patient-insureds) and interference with Plaintiffs' ability to provide life-saving SUD treatment and services to individuals in desperate need of help.

**FIRST CAUSE OF ACTION**

**Claims for Plan Benefits Under ERISA, 29 U.S.C. §1132(a)(1)(B)**

**Against All Defendants**

147. Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

148. Plaintiffs are OON SUD treatment providers that provided, and continue to provide, medically necessary, verified, preauthorized and covered SUD treatment to individuals with health insurance plans that were sold, insured, managed and/or administered by Defendants, including 83 patients treated between March 1, 2022 and March 15, 2026. The treatment and services provided by

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

Plaintiffs include RTC, PHP, IOP, OP, detoxification, treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management, and laboratory services.

149. Defendants' health insurance plans, for each of the insureds at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, provide coverage for OON SUD treatment and laboratory services. In this regard, the plans, and each of them, provide that covered OON SUD benefits include the following levels of care: RTC, PHP, IOP, and OP. The plans also provide that OON covered SUD services include diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention. The plans further provide coverage for OON laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

150. Plaintiffs allege this claim for relief in connection with their claims for SUD treatment rendered to the insureds, including the 83 patients treated between March 1, 2022 and March 15, 2026, with a health benefit plan governed by ERISA. This claim seeks to recover benefits, enforce rights and clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B). Plaintiffs have standing to pursue these claims as assignees of the insureds' benefits under the ERISA plans. Defendants' insureds orally assigned benefits by their insurance company or health plan to Plaintiffs and Plaintiffs obtained written assignments of benefits from the insureds at issue, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims (*see* paras. 29-31, *supra*). As the assignees of benefits under the ERISA plans, Plaintiffs are beneficiaries entitled to collect benefits under the terms of the ERISA plans, and Plaintiffs are claimants for

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

purposes of ERISA.

151. Defendants' health insurance plans governed by ERISA pay benefits for OON SUD treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention and laboratory services at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying OON benefits at 70% of covered charges, after any outstanding insured cost-sharing amounts, which Defendants deduct from payments to Plaintiffs) until the insured's nominal AOOPM is met, at which time Defendants pay 100% of the covered charges. Plaintiffs are informed and believe, and based thereon allege, that each of the insureds at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, with an ERISA plan had already met their AOOPM at the time they first received services from Plaintiffs, or shortly thereafter. The ERISA plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein Defendants had an inadequate network of SUD treatment providers and clinical laboratories.

152. As alleged herein, the health plans at issue contain one of two different methodologies – either MRC 1 or MRC 2 – to reimburse OON claims like those submitted by Plaintiffs on behalf of the patients at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, and under either methodology, Defendants were obligated to reimburse Plaintiffs' claims at either their full billed charges or with an R&C rate.

153. Defendants did not reimburse Plaintiffs pursuant to the plan language and paid far below an R&C rate.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

154. Defendants, and each of them, insure, sponsor, fund, serve as the designated plan administrator and/or serve as the named plan administrator's designee for the various ERISA health plans at issue.

155. The ERISA health plans at issue expressly state that Cigna acts as plan fiduciary and administrator.

156. With respect to a percentage of the ERISA claims at issue, Cigna delegated to MultiPlan its authority to determine the amount of benefits owed for medically necessary covered services, pursuant to a service agreement that rewarded MultiPlan for reducing the amount of benefits paid to Plaintiffs, using MultiPlan's pricing database of national Medicare claims data for different types of healthcare providers that is wholly unrepresentative of amounts actually charged by or paid to similar medical providers in Plaintiffs' surrounding area, generating unreasonably low payment amounts relative to the reimbursement amounts that would have been generated if Cigna and MultiPlan instead had relied on the reimbursement methodologies set forth in the plans.

157. After Cigna under-reimbursed Plaintiffs' claims that were priced by MultiPlan, Plaintiffs received EOPs from Cigna that are misleading because the EOPs do not explain that Cigna's reimbursements had been based on a methodology inconsistent with the plans' requirements, omitted information from these EOPs about the reimbursement methodology Cigna used, and simply referred Plaintiffs to MultiPlan as plan fiduciary in determining the amount of benefits Cigna would pay under the plans.

158. The various ERISA health plans at issue fall into two categories – fully-insured by Cigna and self-insured by employer-sponsors – but are administered the same.

159. With respect to each ERISA plan at issue in this litigation that is a fully insured plan, Defendants and each of them are responsible for both administering and paying the claims from their own bank accounts, and are the plan administrators

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

and ERISA fiduciaries for these plans.

160. With respect to each ERISA plan at issue in this litigation that is a self-insured plan, Defendants, and each of them, administer these plans pursuant to ASAs, through which Cigna has represented that the ERISA plan sponsors delegated to Defendants, and each of them, the authority and responsibility for all administrative responsibilities, including *inter alia*, providing plan members with plan documents, interpreting and applying the plan terms, making coverage and benefits decisions, handling appeals of coverage and benefits decisions, and providing for payment from their own bank accounts in the form of claim reimbursements, and based on such representation are the plan administrators and ERISA fiduciaries for these plans.

161. With respect to each ERISA plan at issue in this litigation that is a self-insured plan, but which does not specifically designate a plan administrator, Defendants, and each of them, functioned as the *de facto* plan administrators and were specifically designated by the ERISA plan sponsors as the claims administrator, with the same fiduciary duties as expressly designated plan administrators, and as such are the plan administrators and ERISA fiduciaries for these plans.

162. With respect to each ERISA plan at issue in this litigation that is a self-insured plan, Defendants, and each of them, make all benefit determinations and authorize benefit checks to be issued out of their own bank accounts. Periodically, Defendants, and each of them, will notify the ERISA self-funded plan sponsors of the need to replenish their accounts so that benefits can be paid. Defendants, and each of them, control these accounts and are fully responsible for processing the insurance claims and making the determination whether to issue a benefits payment check from these accounts.

163. As alleged herein, Defendants, and each of them, acted as agents for each other with regard to processing the claims under the ERISA plans at issue.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

With respect to the ERISA plans, whether fully-insured or self-insured, Defendants, and each of them, are the proper parties for Plaintiffs to sue because Defendants, and each of them, not the underlying plan sponsor or employer, made and continue to make all the relevant decisions whether to honor or deny claims under the ERISA plans, and exercised and continue to exercise the authority to issue benefit payment checks under the ERISA plans form their own bank accounts.

164. After providing covered treatment and services to the insureds at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, with ERISA plans, Plaintiffs submitted their claims to Defendants for payment in accordance with the procedures for receiving benefits under the terms of the ERISA plans, with the claim forms notifying Defendants that Plaintiffs were submitting the claims as the insureds' assignee. Defendants were obligated to pay Plaintiffs their billed charges or an R&C rate.

165. Instead of paying Plaintiffs the amounts owed under the ERISA plans, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – with respect to the 83 patients treated between March 1, 2022 and March 15, 2026, paid each Plaintiff between 0% and 28.29% of its covered charges and paid Plaintiffs, as a group, 16.42% ($2,519,077.43) of their aggregate covered charges ($15,338,175.60), leaving an aggregate balance due of $12,819,098.17. It was only after Plaintiffs rendered the treatment and services at issue that Defendants refused to properly compensate Plaintiffs for the covered treatment and services rendered to Defendants' insureds.

166. Defendants never informed or advised Plaintiffs during the claims or post-claims process of any anti-assignment ERISA plan terms, and Defendants have thereby waived and are estopped from asserting any anti-assignment plan terms in this action. Likewise, Defendants never provided Plaintiffs with the ERISA plan documents, and Defendants, and each of them, made benefit determinations that

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

were not based on individual plan terms. Similarly, Defendants never provided Plaintiffs with notice of any administrative remedy or exhaustion provisions, limitation of action provisions or any other conditions to coverage under the terms of the plans.

167. During the claim submission and payment process, Defendants put Plaintiffs on various pre-payment review and payment integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Plaintiffs, over and over again. This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims. Plaintiffs complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the ERISA plans and/or repricing agreements, Defendants refused to properly reimburse Plaintiffs for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide Plaintiffs and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Plaintiffs and the insureds with a reasonable opportunity to engage in a meaningful, full and fair claims process and procedure. Defendants' audits, bogus TIN flags and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Plaintiffs (and hundreds of other SUD treatment providers and clinical laboratories) payment in accordance with the law and the ERISA plans.

168. Plaintiffs have made all reasonable efforts to have Defendants adjudicate their claims and have provided Defendants with thousands of pages of treatment records, none of which Defendants even consider for determining coverage. Plaintiffs have exhausted or by law are deemed to have exhausted their administrative remedies under the ERISA plans at issue, and moreover, Defendants'

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

herein alleged pattern of misconduct and misbehavior rendered all potential and further administrative remedies futile.

169. Not all of the ERISA plans at issue require the exhaustion of administrative remedies as a condition precedent to Plaintiffs taking legal action, and those having such conditions couch the material terms of the appeal and grievance process as an optional procedure, stating that if a claim for plan benefits is denied, the insured member or an authorized representative, such as the provider, *may* participate in Defendants' appeals and grievance process.

170. OON providers who have been assigned their patients' rights to reimbursement, such as Plaintiffs, have standing to pursue ERISA claims against Defendants, and their assigned right to reimbursement includes the ability to seek judicial enforcement of that right in this action.

171. ERISA notice and appeal rights belong to the party with the legal right to payment,[24] and the Department of Labor ("DOL") maintains that providers who have been assigned their patients' rights to reimbursement, such as Plaintiffs, are entitled to insist upon their assigned right to challenge the allegedly wrongful decision to deny benefits through a process that complies with the ERISA Claims Regulation.[25]

172. Defendants failed to provide Plaintiffs with proper notice of their appeal rights pursuant to ERISA Claims Regulation (29 C.F.R. § 2560.503-1), which is consistent with Defendants' custom and practice of only giving notice of

---

[24] *See Premier Health Ctr. v. UnitedHealth Grp.*, 292 F.R.D. 204, 221 (D.N.J. 2013) (Out of network providers who have been assigned their patients' rights to reimbursement have standing to pursue ERISA claims against the plan sponsor/administrator, and that "assignment of the right to reimbursement 'must logically include the ability to seek judicial enforcement of that right.'" *Id*., citation omitted.

[25] *See Tri3 Enters., LLC v. Aetna, Inc.*, 2012 WL 6113799, at *29 (3d Cir. Nov. 30, 2012) (DOL Amicus Brief) (Out of network providers who have been assigned their patients' rights to reimbursement are "entitled to insist upon [their] assigned right to challenge the allegedly wrongful decision to deny benefits through a process that complies with the [ERISA] claims regulation.")

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

ERISA appeal rights—if they give notice at all—to parties least likely to exercise them (patients who have assigned their right to payment to providers), and deny those rights to parties most likely to exercise them (providers who have been assigned the right to payment). Defendants' failure to provide Plaintiffs with proper notice of their appeal rights pursuant to ERISA Claims Regulation is a systematic violation of ERISA, deeming the administrative remedies exhausted,[26] constituting a waiver of any condition requiring exhaustion of administrative remedies under the ERISA plans at issue, and estopping Defendants from asserting administrative exhaustion as a defense.

173. Even when these similarly situated Plaintiffs sought to enforce their assigned appeal rights in response to Defendants' wrongful denials and underpayment of plan benefits for similarly situated patients, by giving notice in accordance with the ERISA plans offering an appeal and grievance procedure, and supplying the requisite information and documents, Plaintiffs exhausted the administrative remedies to no avail. Defendants repeatedly requested more and more records (even duplicate requests), conducted sham peer to peer reviews and ultimately upheld their denials and underpayments, representing to Plaintiffs that Defendants' decision was final and no further steps needed to be taken, and not advising Plaintiffs of any further conditions on Plaintiffs' rights to litigate the ERISA claims at issue. All of these facts and circumstances, along with Defendants' insistence that it owes not a penny of the more than $12.8 million in benefits at issue in this action with respect to the 83 patients treated between March 1, 2022 and March 15, 2026, render it reasonable for Plaintiffs to conclude that the

---

[26] 29 C.F.R. § 2560.503–1(*l* ); ; *see Barboza v. California Ass'n of Professional Firefighters* (9th Cir. 2011) 651 F.3d 1073, 1076 ("when an employee benefits plan fails to establish or follow 'reasonable claims procedures' consistent with the requirements of ERISA, a claimant need not exhaust because his claims will be deemed exhausted"); *see also Downey Surgical Clinic, Inc. v. Ingenix, Inc.* (C.D. Cal., May 30, 2014, No. CV 09-5457 PSG (CTX)) 2014 WL 12558848, at *5–6.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

pursuit of an administrative appeal to Defendants would be futile.[27]

174. Defendants, and each of them, have failed to process Plaintiffs' claims in a manner consistent with ERISA, by, among other acts and omissions:

175. Delaying the processing, adjustment and/or payment of claims for periods of time greater than 45 days after submission of the claims in violation of 29 C.F.R. §2560.503-1(f)(2)(iii)(B);

176. Failing and refusing to provide any notice and/or explanation for the denial of benefits, payments or reimbursement of the claims of each of the insureds, in violation of 29 U.S.C. §1133(1);

177. Failing and refusing to provide an adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims of each of the insureds, in violation of 29 U.S.C. § 1133(1);

178. Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the insureds, and by failing and refusing to set forth the specific reasons for such denials, all in violation of 29 U.S.C. §1133(1);

179. Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the insureds, written in a manner calculated to be understood by the participant, in violation of 29 U.S.C. § 1133(1);

180. Failing to afford Plaintiffs and/or their patient insureds with a reasonable opportunity to engage in an appeals process, in violation of 29 U.S.C.

---

[27] *See In re WellPoint, Inc. Out-of-Network UCR Rates Litigation*, 865 F.Supp.2d 1002, 1041–1042 (C.D. Cal. 2011) (providers demonstrated futility by pointing to similarly situated plaintiffs who exhausted administrative remedies to no avail; see also Perkins v. Prudential Insurance Company of America, 417 F.Supp.2d 1149, 1153 (C.D. Cal. 2006) (plaintiff's showing of futility sufficient where the long history of claims and lawsuits between the plaintiff and the insurer showed that the insurer "consistently refused to pay [the plaintiff's] benefits until sued."); *see also Melczer v. Unum Life Ins. Co. Am.*, 2009 WL 792502 (D. Ariz. March 24, 2009) (futility adequately shown where there was evidence regarding the lack of reviews done by the insurer in initial determination of claim such that appeal would be futile)

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

§1133(2);

181. Failing to afford Plaintiffs and/or their patient insureds with a reasonable opportunity to engage in meaningful appeal process which was full and fair, in violation of 29 U.S.C. §1133(2);

182. Failing and refusing to provide Plaintiffs and/or their patient insureds with information pertaining to their rights to appeal, including not limited to those deadlines for filing appeals and/or the requirements that an appeal be filed, in violation of 29 U.S.C. §1133(1);

183. Violating the minimum requirements for employee benefit plans pertaining to claims and benefits by participants and beneficiaries, in violation of 29 C.F.R. § 2560.503-1(a), et seq.;

184. Failing and refusing to establish and maintain reasonable claims procedures in violation of 29 C.F.R. § 2560.503-1(b);

185. Establishing, maintaining and enforcing claims procedures which unduly inhibit the initiation and processing of claims for benefits, in violation of 29 C.F.R. §2560.503.1(b)(3);

186. Precluding and prohibiting Plaintiffs from acting as authorized representatives of the patient insureds in pursuing a benefit claim or appeal of an adverse benefit determination, in violation of 29 C.F.R. §2560.503-1(b)(4);

187. Failing and refusing to design, administer and enforce their processes, procedures and claims administration to ensure that their governing plan documents and provisions have been applied consistently with respect to similarly situated participants, beneficiaries and claimants, in violation of 29 C.F.R. §2560.503-1(b)(5);

188. Failing and refusing to pay benefits for services rendered by Plaintiffs which Defendants authorized, as well as rescinding the same;

189. Failing to offer coverage for mental health and substance use disorder treatment and laboratory services in parity with the medical and surgical benefits

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

afforded by the same plans, as required by 26 U.S.C. §9812(3), as well as other mandates set forth at 26 U.S.C. §9812, et seq.; and

190. Failing and refusing to pay Plaintiffs for the substance use disorder treatments provided to the patient insureds in violation of 26 U.S.C. § 9812(3).

191. Defendants' failure and refusal to provide coverage, reimbursement, payment and/or benefits for the SUD treatment that Plaintiffs rendered to Defendants' insureds/members, and Defendants' denial of health insurance benefits coverage, constitute breaches of the ERISA plans at issue. Plaintiffs seek reimbursement and compensation for any and all payments that they would have received and to which they are entitled to receive as a result of Defendants' breaches and failure to pay benefits and cover the treatments and services rendered by Plaintiffs to Defendants' insureds/members, in amounts according to proof at trial.

192. Defendants have arbitrarily and capriciously breached the obligations set forth in the ERISA plans at issue, and as regulated by ERISA and implementing regulations incorporated into the plans, and Defendants have arbitrarily and capriciously breached their obligations under the ERISA plans to provide Plaintiffs and the patient insureds with health benefits.

193. To remedy Defendants' wrongful conduct, Plaintiffs seek an order awarding them an amount equal to the amount of benefits Plaintiffs should have received and to which the patient insureds would have been entitled had Defendants paid the proper amounts, in amounts according to proof at trial, as direct and proximate result of the denial of plan benefits and other wrongful conduct by Defendants, and each of them, as alleged herein.

194. Plaintiffs are entitled to an award of reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). As a result of the actions and failings of Defendants, and each of them, Plaintiffs have retained the services of legal counsel and have necessarily incurred attorney's fees and costs in prosecuting this litigation. Furthermore, Plaintiffs anticipate incurring additional attorney's fees and costs

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

hereafter pursing this litigation and recovery of amounts due and owed by Defendants.

**<u>SECOND CAUSE OF ACTION</u>**

**Breach of Written Contract**

**(Non-ERISA Plans)**

**Against All Defendants**

195. Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

196. Plaintiffs allege this cause of action in connection with its claims for SUD treatment and services rendered to the insureds, including the 83 patients treated between March 1, 2022 and March 15, 2026, with health insurance plans not governed by ERISA. Plaintiffs bring this cause of action as assignees and third-party beneficiaries of the non-ERISA health insurance plans at issue.

197. Plaintiffs are OON SUD treatment providers that provided medically necessary, verified, preauthorized and covered SUD treatment to individuals, including the 83 patients treated between March 1, 2022 and March 15, 2026, with health insurance that was sold, insured, managed and/or administered by Defendants, including the non-ERISA health plans. The treatment and services provided by Plaintiffs include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.

198. Defendants' health insurance plans, for each of the 83 insureds at issue, provide coverage for OON SUD treatment and laboratory services. In this regard, the plans, and each of them, provide that OON SUD benefits include the following levels of care: RTC, PHP, IOP, and OP. The plans also provide that covered OON SUD services include diagnostic evaluations, assessment and treatment planning,

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention. The plans further provide coverage for OON laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

199. Defendants' health insurance plans, for each of the insureds at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, pay benefits for OON SUD treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying OON benefits at 70% of covered charges, after any outstanding insured cost-sharing amounts, which Defendants deduct from payments to Plaintiffs) until the insured's nominal AOOPM is met at which time Defendants pay 100%. Plaintiffs are informed and believe, and based thereon alleges, that each of the insureds, including the 83 patients treated between March 1, 2022 and March 15, 2026, had already met their AOOPM at the time they first received treatment or services from Plaintiffs, or shortly thereafter. The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. Plaintiffs are informed and believe, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of SUD treatment providers and clinical laboratories. The exclusions, conditions and limitations in the plans do not apply to the treatments and services provided by Plaintiffs.

200. The intended benefits set forth in Defendants' non-ERISA health plans

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

are the same in all material respects as to the claims at issue for those of Defendants' insureds with a health benefit plan not governed by ERISA, and each provides coverage for the SUD services rendered by Plaintiffs as mandated by state and federal law.

201. As alleged herein, the health plans at issue contain one of two different methodologies – either MRC 1 or MRC 2 – to reimburse OON claims like those submitted by Plaintiffs on behalf of the patients at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, and under either methodology, Defendants were obligated to reimburse Plaintiffs' claims at either their full billed charges or with an R&C rate.

202. Defendants did not reimburse Plaintiffs pursuant to the plan language and paid far below an R&C rate.

203. Defendants promised they would reimburse Plaintiffs pursuant to these terms of the plans. However, Defendants did not use these purported methodologies to calculate the reimbursement rates for any of the underlying claims at issue in this action.

**Assignees**

204. Plaintiffs obtained oral and written assignments of benefits from each of the insureds at issue, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.

205. Moreover, Defendants confirmed, represented, promised and warranted to Plaintiffs through the required verification of benefits and the preauthorization process, that each of the insureds and their respective OON treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants, the premiums were paid and the plans were effective, and that Plaintiffs, as assignee of the insureds, would be paid for treating Defendants' insureds. At all times relevant herein, Defendants knew that Plaintiffs were treating

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of Plaintiffs' charges for the treatment and services rendered, at each level of care.

**Third Party Beneficiaries**

206. Plaintiffs are also express and intended third-party beneficiaries of the health insurance plans between Defendants and the insured patients treated by Plaintiffs, including the 83 patients treated between March 1, 2022 and March 15, 2026, and are entitled to recover on that basis.

207. Defendants and their insureds intended that Plaintiffs directly benefit from the health insurance plans, and the plans indicate the intent to benefit Plaintiffs by providing for payment to Plaintiffs for the treatment and services provided to Defendants' insureds.

208. The health insurance plans issued, managed and/or administered by Defendants provide their insureds with the option of seeking treatment with Defendants' INN providers or choosing their own OON providers, like Plaintiffs. The plans also provide for the payment of benefits for OON providers, like Plaintiffs, who provide medically necessary services to the insureds. Although the plans issued, managed and/or administered by Defendants may incentivize their insureds to seek treatment with INNs, the plans explicitly express Defendants' intent to benefit OON providers, like Plaintiffs.

209. The health insurance plans issued, managed and/or administered by Defendants further express Defendants' intent to benefit OON providers, like Plaintiffs, insofar as the plans expressly incorporate by reference regulations requiring insurers, like Defendants, to provide an adequate network of INN providers and, in the event of a "network inadequacy" or "network gap," requiring insurers, like Defendants, to pay for the required care with available and accessible OON providers, like Plaintiffs, with the insureds responsible for paying only cost-sharing in an amount equal to the cost-sharing they would have paid for provision of

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

that or a similar service by an INN provider.

210. Defendants' intent to benefit OON providers, like Plaintiffs, by the terms of the health insurance plans at issue is further evidenced by the conduct of the Defendants, who issued payments to OON providers, including Plaintiffs, for the medically necessary treatment and services rendered to their insureds, in accordance with the terms of the plans, until in or around 2015, when the Defendants, as part of their scheme to decrease their costs on mental health and SUD treatment claims, conspired, concocted and implemented their plans to significantly decrease, and in some cases completely ceased reimbursing, OON providers providing SUD treatment and related services, including Plaintiffs.

211. As set forth hereinabove, Plaintiffs provided covered, verified, preauthorized and medically necessary SUD treatment to Defendants' insureds, including the 83 patients treated between March 1, 2022 and March 15, 2026, at great expense to Plaintiffs. After providing the services, Plaintiffs submitted their claims to Defendants for payment, requesting compensation for the treatment and services provided to the insureds.

212. After providing covered treatment and services to the insureds at issue, including the 83 patients treated between March 1, 2022 and March 15, 2026, Plaintiffs submitted their claims to Defendants for payment. Defendants were obligated – under the law and the plans – to pay Plaintiffs the applicable plan percentage of their covered charges (between 50% to 80% of covered charges, with the majority of plans paying OON benefits at 70% of covered charges, after any outstanding insured cost-sharing amounts) until the insured's nominal AOOPM is met, at which time Defendants pay 100%. Instead of paying Plaintiffs per the plan documents and the law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic policies, practices and decisions – with an emphasis on profits over patients – and with respect to the 83 patients treated between March 1, 2022 and March 15, 2026, paid each Plaintiff between 0% and

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

28.29% of its covered charges and paid Plaintiffs, as a group, 16.42% ($2,519,077.43) of their aggregate covered charges ($15,338,175.60), leaving an aggregate balance due of $12,819,098.17.

213. Plaintiffs have performed all, or substantially all, of the significant things required of them under the health insurance plans, except as excused by Defendants' material breaches.

214. Defendants, and each of them, breached the health insurance plans by the conduct alleged herein, including without limitation withholding of proper claim payments from Plaintiffs, making unreasonable demands on Plaintiffs, not engaging in a prompt, full and complete investigation of Plaintiffs' claims, and interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when, in fact, coverage exists and benefits are owed to Plaintiffs.

215. As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered and will continue to suffer in the future, economic loss, including the benefits owed under the health insurance plans and the law in the millions of dollars, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits, and other general, incidental and consequential damages, in amounts according to proof at trial. Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

**<u>THIRD CAUSE OF ACTION</u>**

**Breach of Oral Contract**

**Against All Defendants**

216. Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

217. Wholly unrelated to Defendants' obligations under the health plans at issue, and as part of verifying benefits and authorizing treatment when necessary, and in multiple communications following admissions and the submission of claims, Defendants, and each of them, orally promised to pay Plaintiffs for the treatment

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

and services provided to Defendants' insureds, including the 83 patients treated between March 1, 2022 and March 15, 2026, an amount equal to a percentage of their billed charges (between 50% to 80% of billed charges, with the majority of claims promised by Defendants to be paid at 70% of billed charges) until the insured's nominal AOOPM is met, at which time Defendants pay 100%.

218. The persons answering calls and corresponding on behalf of Defendants, and each of them, were upon information and belief the agents and employees of Defendants, and each of them, and in doing the things herein alleged were acting within the course and scope of such agency and employment and with the permission and consent of Defendants, and each of them.

219. Plaintiffs have performed all duties required of them under the oral contracts, except as excused by Defendants' material breaches.

220. Defendants and each of them, however, breached the oral contracts by the conduct alleged herein, including without limitation the withholding of proper claim payments.

221. As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered general and incidental damages according to proof and are entitled to statutory and prejudgment interest and attorney's fees against Defendants. Under this cause of action, Plaintiffs seek to recover the benefits orally promised, which are equal to a percentage of their covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

222. As a direct and proximate result of Defendants' breaches, Plaintiffs have incurred and continue to incur economic loss, including the benefits owed in the millions of dollars, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and other consequences, all according to proof.

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

**FOURTH CAUSE OF ACTION**

**Promissory Estoppel**

**Against All Defendants**

223. Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

224. As part of verifying benefits and authorizing treatment when necessary, and in multiple communications following admissions and the submission of claims, Defendants expressed a clear promise to pay Plaintiffs for the treatment and services provided to Defendants' insureds, including the 83 patients treated between March 1, 2022 and March 15, 2026, on the same terms as provided for in the plans between Defendants and their insureds; specifically, payments to Plaintiffs equal to a percentage of their covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal AOOPM is met, at which time Defendants pay 100%.

225. The persons answering calls and corresponding on behalf of Defendants, and each of them, were upon information and belief the agents and employees of Defendants, and each of them, and in doing the things herein alleged were acting within the course and scope of such agency and employment and with the permission and consent of Defendants, and each of them.

226. Plaintiffs relied on Defendants' promises in providing the subject treatment and services to Defendants' insureds, and Defendants, and each of them, should reasonably have expected this to induce Plaintiffs' action in providing said treatment and services to Defendants' insureds.

227. Plaintiffs have suffered substantial detriment in reliance upon Defendants' promises in providing treatment and services to Defendants' insureds, including without limitation the benefits owed in the millions of dollars, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and

ARNALL GOLDEN GREGORY LLP
A LIMITED LIABILITY PARTNERSHIP
2100 PENNSYLVANIA AVENUE, NW, SUITE 350S
WASHINGTON, DC 20037
TELEPHONE: (202) 677.4030
WWW.AGG.COM

other consequences, all according to proof at trial.

228. As a direct and proximate result of Defendants' breach of their promises, Plaintiffs are also entitled to statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

## PRAYER

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, and that the Court award the following relief:

1. For compensatory, general and special damages in amounts to be proven at trial;
2. For statutory and prejudgment interest;
3. For disgorgement of all cost-containment fees received by Defendants under the ASAs for the adjudication of Plaintiffs' claims, which amounts should have been paid to Plaintiffs;
4. For costs incurred in connection with this lawsuit;
5. For attorneys' fees;
6. For injunctive and equitable relief; and
7. For all other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury for all claims triable by jury.

Date: August 19, 2026

**ARNALL GOLDEN GREGORY LLP**

By: */s/ Richard T. Collins*
Richard T. Collins
(*Notice of Appearance forthcoming*)
Attorney for Plaintiffs